640 S.E.2d 102

**COPIER WORD PROCESSING SUPPLY, INC., Plaintiff,**

v.

**WESBANCO BANK, INC., et al., Defendants.**

No. 33046.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 13, 2006.

Decided: Nov. 15, 2006.

Dissenting Opinion of Justice Starcher Nov. 30, 2006.

Dissenting Opinion of Justice Albright Dec. 1, 2006.

James R. Leach, Victoria J. Sopranik, Jim Leach, L.C., Parkersburg, for the Plaintiff.

Robert W. Full, Goodwin & Goodwin, LLP, Parkersburg, James C. Gardill, J. Christopher Gardill, Phillips, Gardill, Kaiser & Altmeyer, PLLC, Wheeling, for the Defendants.

Sandra M. Murphy, Thomas A. Heywood, Julia A. Chincheck, Bowles Rice McDavid Graff & Love, Charleston, for Amici Curiae West Virginia Ass'n of Community Bankers, Inc., and West Virginia Bankers Ass'n.

DAVIS, Chief Justice.

This case presents certified questions relating to whether the continuing tort theory may be applied to toll the three-year statute of limitations set out in W. Va.Code § 46–3–118(g) (1993) (Repl.Vol.2001) in connection with a civil action for the conversion of multiple, separate negotiable instruments. We conclude that the continuing tort theory may not be so applied.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts pertinent to the resolution of the questions herein certified are undisputed. Copier Word Processing Supply, Inc. (hereinafter referred to as "Copier"), the plaintiff in this action, hired Doris Hendrickson in 1985. Ms. Hendrickson was eventually promoted to the position of office manager in 1994. In May of 2003, Copier discovered

that Ms. Hendrickson had been embezzling its funds for a period of several years and discharged her from its employ. Based upon the discovery that has occurred in the proceedings below, Copier now believes that Ms. Hendrickson's embezzlement may have begun as early as 1991.

Ms. Hendrickson carried out her embezzlement of Copier's funds by depositing checks, which were received from Copier's vendors and were made payable to Copier, into personal accounts she held at WesBanco Bank, Inc. (hereinafter referred to as "WesBanco"), the defendant in this action. To embezzle the funds, Ms. Hendrickson would intercept checks that had been mailed to Copier by its vendors. She would then locate the corresponding invoices and "zero out" the invoices with a credit memo. Finally, she would sign the back of the check with an endorsement purported to be "CWS," meaning Copier Word Processing Supply, and "John Alkire: Pres., Doris Hendrickson, Treas.," and deposit the check into one of two personal checking accounts she maintained at WesBanco.[1] Often she would receive some cash from the deposit transaction.[2] Copier alleges that, over the years, Ms. Hendrickson repeated this process at least 721 times, embezzling approximately $472,000.00, and that no one at WesBanco at any time questioned her authority to deposit the corporate checks into her personal accounts.[3]

On October 6, 2003, Copier filed a civil action for conversion against Ms. Hendrickson, and for negligence and conversion against WesBanco.[4] In November 2003, WesBanco filed its answer along with a

cross-claim against Ms. Hendrickson. Ms. Hendrickson failed to file an answer; therefore, default judgment was entered against her on February 4, 2005.

Copier filed a motion for summary judgment against WesBanco in November 2004 asserting, in relevant part, that the acts of conversion at issue in this case amounted to a continuing tort such that the statute of limitations would not begin to run until the date of the last act of conversion. WesBanco subsequently filed a motion for judgment on the pleadings claiming that the three-year statute of limitations applicable to actions for conversion of negotiable instruments pursuant to W. Va.Code § 46–3–118(g) served to bar Copier's claims with respect to any negotiable instruments negotiated more than three years prior to the filing of the original complaint in this matter. On February 4, 2005, a hearing was held on all motions. Following the hearing, by order entered on February 28, 2005, the circuit court denied Copier's motion for summary judgment and granted WesBanco's motion for judgment on the pleadings. Accordingly, the circuit court awarded partial judgment in favor of WesBanco and dismissed with prejudice Copier's cause of action with respect to any of the negotiable instruments alleged to have been negotiated more than three years prior to the filing of Copier's original complaint on October 6, 2003.

Subsequently, on May 9, 2005, Copier filed a motion requesting that the circuit court certify to this Court questions clarifying whether the continuing tort theory applies to the limitations period provided in W. Va.

1. Ms. Hendrickson shared one of the two WesBanco accounts with her son, Steven Hendrickson. The other account was held in her own name only. Fraudulently endorsed checks were deposited into both accounts.

2. When Ms. Hendrickson received cash back from a deposit to the account held solely in her own name, she would often deposit that cash into the account she shared with her son.

3. Ms. Hendrickson was indicted for embezzlement and, pursuant to a plea agreement, pled guilty to the offense.

4. Copier subsequently filed an amended complaint to correct the name of WesBanco, which had been incorrectly designated as WesBanco,

Inc., on the original complaint. In July 2004, Copier filed a second amended complaint to add as a defendant Ms. Hendrickson's son, Steven Hendrickson, who shared one of the personal bank accounts with Ms. Hendrickson. WesBanco answered the second amended complaint and also asserted a cross-claim against Steven Hendrickson. Steven Hendrickson timely answered the complaints, but subsequently filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of West Virginia. Accordingly, he is not presently a party to this action due to the automatic stay provision of the United States Bankruptcy Code.

Code § 46–3–118(g). The circuit court granted Copier's motion and certified the following two questions to this Court:

In a case governed by the three year limitations period provided for in West Virginia Code 46–3–118(g):

(a) Does the continuing tort theory apply to the alleged conversion of multiple, separate negotiable instruments made payable to the plaintiff's business by an employee of plaintiff to her personal checking account at defendant bank over a period of several years, such that the cause of action accrues at, and the statute of limitations does not begin to run until, the date of the alleged conversion of the last negotiable instrument, permitting damage claims for instruments allegedly converted more than three years prior to the filing of the complaint, or

(b) Does the cause of action accrue and the limitations period run from the date of the negotiation of each separate instrument permitting damage claims only for such instruments allegedly converted within such three year period prior to the filing of the complaint?

The circuit court answered question (a) in the negative and answered question (b) in the affirmative. This Court accepted the certified questions for review by order entered March 2, 2006. Having considered the parties' appellate briefs, including the brief of *amici curiae*,[5] the pertinent authorities, and the oral arguments presented, we now answer the certified questions in the same manner they were answered by the circuit court.[6]

---

**5.** We pause briefly to acknowledge the appearance of the West Virginia Association of Community Bankers, Inc., and the West Virginia Bankers Association, Inc., as *amici curiae*, who filed a brief in support of the circuit court's answers to the certified questions. We appreciate their participation and consider their position in determining the outcome of this case.

**6.** Copier has invited this Court to invoke its authority to reformulate a certified question in order to address an additional question resolving the applicability of the discovery rule to this case. *See* W. Va.Code § 51–1A–4 (1996) (Repl.Vol.

## II.

### STANDARD OF REVIEW

◼ "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo.*" Syl. pt. 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

## III.

### DISCUSSION

◼ The issue at the heart of the questions certified in this case seeks to determine what portion of Copier's claims survive the applicable statute of limitations. The causes of action asserted by Copier are governed by the three year statute of limitations set out in W. Va.Code § 46–3–118(g), which states

Unless governed by other law regarding claims for indemnity or contribution, an action (I) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty or (iii) to enforce an obligation, duty, or right arising under this article and not governed by this section must be commenced within three years after the cause of action accrues.

Because many of the transactions between WesBanco and Ms. Hendrickson involving the fraudulently endorsed checks occurred more than three years before Copier filed its complaint in this case, Copier sought to extend the operation of the statute of limitations by asserting that WesBanco's conduct amounted to a continuing tort. We find three separate grounds for reaching our conclusion that the circuit court correctly rejected the continuing tort theory when answering the questions herein certified. First, the

---

2000) ("The [S]upreme [C]ourt of [A]ppeals of West Virginia may reformulate a question certified to it."); Syl. pt. 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993) ("When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in *W. Va.Code*, 51–1A–1, *et seq.* and *W. Va.Code*, 58–5–2 [1967], the statute relating to certified questions from a circuit court of this State to this Court."). We decline this invitation.

act of converting multiple, separate negotiable instruments does not fall within the meaning of a continuing tort as that theory has been previously applied in West Virginia; second, the statutory provision setting out the applicable statute of limitations clearly expresses a legislative intent that each act of conversion be treated separately for limitations purposes; and finally, application of a continuing tort theory would be contrary to the policy and purposes underlying the Uniform Commercial Code (hereinafter referred to as "the UCC").

### A. Continuing Tort Theory

We begin our analysis of this case by examining the continuing tort theory to ascertain whether it is amenable to application in the context of the conversion of a negotiable instrument. This Court formally adopted the continuing tort theory in Syllabus point 11 of *Graham v. Beverage*, which states:

Where a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease.

211 W.Va. 466, 566 S.E.2d 603 (2002). Thus, *Graham* instructs that in order to toll the statute of limitations under a continuing tort theory, there must be a "continuing or repeated injury." *Id.* To determine whether the conversion of multiple, separate negotiable instruments amounts to "a continuing or repeated injury," we find it useful to review some of the circumstances under which we have either applied or declined to apply a continuing tort theory.

The pertinent portion of the *Graham* opinion involved a lawsuit by home owners Spencer and Helen Graham against Earle and Jean Parker. The Parkers were the developers of a housing complex adjacent to the Grahams' property. In the course of building the complex, a storm water management system, also referred to as an infiltration system, was constructed. The storm water management system allegedly altered the flow of surface water onto the Grahams' land thereby causing damage to the Grahams' real and personal property. The circuit court granted summary judgment in favor of the Parkers with respect to the Grahams' negligence claim based in part upon its finding that the cause of action was "time-barred by the relevant statute of limitations." *Graham v. Beverage*, 211 W.Va. at 476, 566 S.E.2d at 613. The Grahams appealed to this Court claiming, in part, that the Parkers' conduct amounted to "a continuing breach of duty causing a continuing or repeated injury"; therefore, the statute of limitations did not begin to run "until the date of the last injury." *Id.* The *Graham* Court observed that

the thrust of the Grahams' complaint is that the construction of the infiltration system as well as the continuing wrongful conduct of the Parkers in negligently failing to take action with regard to correcting the alleged inadequacies of that system is causing continuing injuries to their real and personal property.

*Id.* at 477, 566 S.E.2d at 614. The Court then concluded that "we do not find the negligence claim time-barred because the alleged negligence of the Parkers complained of by the Grahams constitutes *continuing wrongful conduct from which continuing injuries emanate.*" *Id.* (emphasis added).

Syllabus point 11 of *Graham*, which formally adopted the continuing tort theory in this jurisdiction, was derived from this Court's per curiam opinion in *Handley v. Town of Shinnston*, 169 W.Va. 617, 289 S.E.2d 201 (1982). In *Handley*, a water transmission line installed on the Handleys' property by the Town of Shinnston began to leak sometime in 1972. The town was notified of the leak at that time. Nevertheless, the leak "continued until October, 1976, when the waterline ruptured causing a crack to appear on the surface of the [Handleys'] yard." *Handley*, 169 W.Va. at 618, 289 S.E.2d at 202. Although the town repaired the crack, the leak continued until the waterline was removed in 1978. The crack that had initially appeared in 1976 continued to "expand and slip" even after the removal of the waterline. *Id.* "As a result, a large crater developed in the yard, and the foundation of the house shifted." *Id.* The Handleys'

filed their civil action on May 10, 1979. The circuit court granted summary judgment in favor of the town finding that the action was barred by the applicable two-year statute of limitations. On appeal, this Court reversed, reasoning that

> In this case it is clear that the damage did not occur all at once but increased as time progressed; each injury being a new wrong. . . .
>
> Donald Handley's deposition indicates that the damage to the property continued even after the suit was filed. If the tortious act in this case did indeed cease, it was not until 1978, when the leaking waterline was removed from the appellants' property. As the record clearly shows that the appellants filed suit on May 10, 1979, less than two years after the waterline was removed, the action was not barred by the statute of limitations, and the circuit court erred in granting summary judgment. . . .

169 W.Va. at 619–20, 289 S.E.2d at 202–03. The *Graham* and *Handley* cases both demonstrate instances where a wrongful act was sustained over time, causing continuing damages.[7] Having observed circumstances under which this Court has applied the continuing tort theory, we now consider cases wherein the theory was rejected.

In *Ricottilli v. Summersville Memorial Hospital,* 188 W.Va. 674, 425 S.E.2d 629 (1992), Mrs. Ricottilli filed suit against Summersville Memorial Hospital, Charleston Area Medical Center (hereinafter referred to as "CAMC"), and others, in connection with the death of her six-year-old daughter. Mrs.

Ricottilli's complaint against CAMC was dismissed, apparently at least in part due to the expiration of the statute of limitations.[8] Mrs. Ricottilli's claims against CAMC were for outrageous conduct or intentional infliction of emotional distress resulting from CAMC's nearly ten month delay in providing Mrs. Ricottilli with a copy of her daughter's autopsy report, and its failure to report the results of a particular tissue sample analysis. Her lawsuit was filed outside the applicable one-year statute of limitations. Mrs. Ricottilli argued that CAMC's conduct amounted to a continuing tort. This Court rejected the theory noting that "the concept of a continuing tort requires a showing of repetitious, wrongful conduct." *Ricottilli,* 188 W.Va. at 677, 425 S.E.2d at 632 (citation omitted). The *Ricottilli* Court further observed that

> as this Court explained in *Spahr v. Preston County Board of Education,* 182 W.Va. 726, 391 S.E.2d 739 (1990), a wrongful act with consequential continuing damages is not a continuing tort. *Id.* at 729, 391 S.E.2d at 742. The alleged continuing wrong in this case is the untimely and incomplete autopsy report as well as the failure of CAMC to date to report the results of the tissue sample analysis.

With regard to the dilatoriness of the autopsy report, upon its tender to Appellant on January 9, 1990, or thereabouts, the act of delay was fixed and the only aspect of the claim that could be said to continue is damages, but not the wrongful act itself. *See id.* Similarly, the incompleteness of the autopsy report, insofar as Appellant contends the absence of a specif-

---

7. Copier also directs our attention to *Taylor v. Culloden Public Service District,* 214 W.Va. 639, 591 S.E.2d 197 (2003). In *Taylor,* the owner/operator of a wastewater treatment facility continuously dumped untreated sewage into Indian Creek Fork, causing damage to adjacent property owned by Bobby and Shirley Ball. The Balls intervened in an action brought against the treatment facility by the Division of Environmental Protection and alleged that the treatment facility's conduct created a nuisance. After concluding that the nuisance created was a temporary nuisance, the *Taylor* Court explained that "the temporary nuisance continues until such time as those acts are abated or discontinued." 214 W.Va. at 647, 591 S.E.2d at 205. Based upon its conclusion that the temporary nuisance was a

continuing act, the Court applied the continuing tort theory and found that the relevant statute of limitations did not run until the nuisance was abated. *Id.* We find no distinction in the manner in which the continuing tort theory was applied in *Taylor* and the way it was applied in *Graham* and *Handley.*

8. The circuit court failed to identify, and the record did not reveal, the specific grounds relied upon to grant CAMC's motion to dismiss. *Ricottilli,* 188 W.Va. 674, 676, 425 S.E.2d 629, 631. Accordingly, this Court addressed both arguments asserted by CAMC in its motion to dismiss, one of which was the expiration of the relevant statute of limitations. *Id.*

ic cause of death renders the report incomplete, as a wrongful act was fixed as of January 9, 1990. With regard to the tissue report, Appellant contends and CAMC does not dispute that she first learned through CAMC's appellate brief, which was filed with this Court on August 26, 1992, that "[b]ecause the liver tissue had been embalmed and no tests could be performed, there are no liver tissue test results to be reported." Given the facts currently before this Court, the applicable statute of limitations with regard to any delay in the issuance of the tissue report would start to run on August 26, 1992. Were this Court to discover or be apprised that the Appellant did have knowledge at an earlier point in time regarding the deficient tissue samples, we would accordingly adjust the onset date for the applicable limitations period. *Because Appellant's claims pertaining to the autopsy and tissue reports are fixed acts and do not involve continuing wrongful conduct, the continuing tort theory is inapposite.*

*Ricottilli,* 188 W.Va. at 677–78, 425 S.E.2d at 632–33 (emphasis added) (footnote omitted). In the instant case, Copier contends that, unlike CAMC's conduct, the conversion of multiple, separate negotiable instruments amounts to "repetitious, wrongful conduct." *Id.* at 677, 425 S.E.2d at 632. We disagree, as this Court has made a distinction between "repetitious, wrongful conduct" that amounts to a continuing tort, *id.,* and "similar, but separate" acts that do not. *DeRocchis v. Matlack, Inc.,* 194 W.Va. 417, 423, 460 S.E.2d 663, 669 (1995).

 *DeRocchis* involved a chemical truck driver who was repeatedly exposed to toluene diisocyanate during the course of his employment from 1972 until March or April 1989. The repeated chemical exposure resulted in Mr. DeRocchis suffering a diminished pulmonary function. In April 1990, he filed a lawsuit against his employer. One of the issues in this lawsuit was whether the repeated chemical exposures constituted one continuing tort. In reaching the conclusion that Mr. DeRocchis' various exposures were separate injuries as opposed to one continuous tort, the Court observed that "[i]n the present case, it appears that the appellant,

Peter Vincent DeRocchis, sustained a number of discrete injuries and that, in effect, he was exposed to isocyanate fumes on a number of different discrete occasions." *DeRocchis,* 194 W.Va. 417, 422, 460 S.E.2d 663, 668. The *DeRocchis* Court explained that it

> conceives a "continuing cause of action" as being a situation where events, which for all practical purposes are identical, occur repeatedly, at short intervals, in a consistent, connected, rhythmic manner.

> In the present case, the facts developed suggest the traumatic events, Mr. DeRocchis' exposure to isocyanate fumes, occurred in such a sporadic and nonconsistent way as to constitute separate causes of action.

194 W.Va. at 423 n. 4, 460 S.E.2d at 669 n. 4. The Court also held that

> [w]hen, in the course of employment, a person receives a number of similar, but separate, injuries, each injury gives rise to a separate and distinct cause of action. Further, the statute of limitations for each cause of action begins to run from the date of the injury giving rise thereto, without regard to any previous injury or injuries.

Syl. pt. 3, *DeRocchis.* Although the type of injury involved in *DeRocchis* is not directly on point with the conversion of negotiable instruments at issue in the instant case, it nevertheless instructs that "a 'continuing cause of action'" is found in "a situation where events, which for all practical purposes are identical, occur repeatedly, at short intervals, in a consistent, connected, rhythmic manner" 194 W.Va. at 423 n. 4, 460 S.E.2d at 669 n. 4., and that "similar, but separate" injuries each give rise to a separate and distinct cause of action. Syl. pt. 3, *DeRocchis.*

A final case we find useful to our analysis is *Auber v. Jellen,* 196 W.Va. 168, 469 S.E.2d 104 (1996). Over a period of about one year and nine months, Mr. Auber was seen by Dr. Jellen on five separate occasions and received five different diagnoses. Mr. Auber was then referred to a specialist, Dr. Kalla, who diagnosed his condition as rectal cancer. Mr. Auber subsequently filed a malpractice

action against Dr. Jellen. The parties stipulated that,

> Doctor Kalla's opinion, to a reasonable degree of medical certainty, based upon the size of the tumor and type of cancer, was that the tumor and cancer had been present in Mr. Auber for more than two years, thus placing the onset of the cancerous condition prior to Doctor Jellen's first examination of Mr. Auber....

196 W.Va. at 171, 469 S.E.2d at 107. The parties ultimately reached a settlement under which Dr. Jellen's insurer paid the limits of one policy of insurance, and it was agreed that Mr. Auber would file a declaratory judgment action to determine if any additional medical liability insurance coverage was available under other insurance policies sold to Dr. Jellen. *Id.* In the declaratory judgment action, a question arose with respect to "whether the five examinations and misdiagnoses constituted a 'continuing tort.'" 196 W.Va. at 173, 469 S.E.2d at 109. Relying on the *DeRocchis* opinion, the *Auber* Court reasoned,

> The rationale of *DeRocchis* is applicable to the appeal before us. As was pointed out by the court below, there was not a continuing course of treatment with respect to each of the five examinations. Each examination produced a different misdiagnosis; each examination commenced a new line of treatment; each examination was an occasion of delay or further delay in the prompt and appropriate treatment of the rectal cancer. These discrete examinations, misdiagnoses and disparate treatments were not, in the words of *Handley*, identical, occurring repeatedly, at short intervals, in a consistent,

connected, rhythmic manner. Just as in *DeRocchis*, where several discrete exposures each contributed to a worsening condition, each examination and misdiagnosis of Mr. Auber left Mr. Auber's tumor undetected, which, with each delay, grew and worsened. On each occasion, with each physical examination and misdiagnosis, a new course was set upon, being each time a discrete negligent act or omission and occasion of injury to Mr. Auber.

196 W.Va. at 174, 469 S.E.2d at 110.

In light of the foregoing discussion, we find that the conversion of the multiple, separate negotiable instruments at issue in this case does not amount to a continuing tort. Conversion of negotiable instruments is unlike the circumstances created in *Graham* and *Handley*, where wrongful conduct created a specific continuing injury, which was then perpetuated by the tortfeasor's failure to take corrective action. Instead, we find that the conversion of negotiable instruments creates a circumstance more akin to that described in *DeRocchis* and *Auber*. As with the multiple exposures and multiple misdiagnoses in those cases, the act of converting multiple, yet separate, negotiable instruments does not lend itself to being classified as "events, which for all practical purposes are identical, occur repeatedly, at short intervals, in a consistent, connected, rhythmic manner." *DeRocchis*, 194 W.Va. at 423 n. 4, 460 S.E.2d at 669 n. 4. Rather, while the multiple conversions were carried out repeatedly over time, each conversion was a discrete act, a single transaction involving a specifically individual negotiable instrument.[9] Thus, each conversion, though similar, was a distinctly separate transaction.[10] We need

---

**9.** A Louisiana court addressing a factually similar case reached the same conclusion:

Metro Electric asserts that the actions of Bank One constituted a continuing tort, and thus prescription did not begin to run. This argument lacks merit. Each deposit by Ms. Riser of Metro Electric checks into Computer Power's account, and Bank One's subsequent seeking of payment for Computer Power, constituted a separate conversion with separate damages. There is neither a continuous action on the part of Bank One nor a continuous damage suffered by Metro Electric, both of which are necessary to find a continuing tort....

*Metro Elec. & Maint., Inc. v. Bank One Corp.,* 924 So.2d 446, 451 (La.Ct.App.2006) (citation omitted).

**10.** Copier directs our attention to two lower court cases from Illinois that applied a continuing tort theory to the conversion of negotiable instruments, *Field v. First National Bank of Harrisburg,* 249 Ill.App.3d 822, 189 Ill.Dec. 247, 619 N.E.2d 1296 (1993), and *Haddad's of Illinois, Inc. v. Credit Union 1 Credit Union,* 286 Ill. App.3d 1069, 222 Ill.Dec. 710, 678 N.E.2d 322 (1997). In *Field,* the Appellate Court of Illinois, Fifth District, lamented that it was "unable to find any cases in which a series of checks cashed

not rely solely on the law relating to continuing torts in answering the certified questions presented in this case; however, as the applicable statute clearly expresses the Legislature's intent in this regard.

### B. West Virginia Code § 46–3–118(g)

The statutory provision that establishes the period of limitations applicable to acts of conversion states, in relevant part, that "an action ... for conversion of *an instrument,* for money had and received, or like action based on conversion, ... must be commenced within three years after the cause of action accrues." W. Va.Code § 46–3–118(g) (emphasis added).[11] It is well established that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). However, it is equally well settled that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951). *See also Sizemore v. State Farm Gen. Ins. Co.,* 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) ("A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that

reasonable minds might be uncertain or disagree as to its meaning." (internal quotations and citation omitted)).

We find no ambiguity in the language of W. Va.Code § 46–3–118(g). By stating the period of limitations applicable to the conversion of "an instrument," we believe the Legislature has plainly expressed its intention that each act of conversion be treated as a separate violation for limitations purposes. It has been stated that "[g]enerally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 107 S.E.2d 353 (1959). *Cf.* Syl. pt. 1, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941) ("In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used."), *overruled on other grounds by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982). The familiar usage and meaning of the term "an," when used in the manner in which it appears in W. Va. Code § 46–3–118(g), is singular. As one court has explained

"An" is a euphonic mutation of the article "a." Webster's Third New International Dictionary 75 (1993). The letter "n" allows

---

is said to constitute a single transaction for purposes of the running of the statute of limitations...." 249 Ill.App.3d at 825, 189 Ill.Dec. 247, 619 N.E.2d at 1299. Nevertheless, the court concluded that a daughter's repeated conversion of her father's retirement checks over his restrictive endorsement amounted to a " 'scheme, plan, conspiracy, or the like' which would transform the deposits into what could be considered a single transaction." *Id.* In *Haddad,* the Appellate Court of Illinois, Fourth District, cited with approval the holding of *Field,* but ultimately found that, even applying the *Field* rule, the plaintiff's action fell outside the applicable statute of limitations. 286 Ill.App.3d at 1072–73, 222 Ill.Dec. 710, 678 N.E.2d at 324. We find the analysis utilized by the *Field* court to be inconsistent with the manner in which the continuing tort theory has been applied in West Virginia, and we therefore decline to follow these cases. Moreover, as Copier has conceded, the Illinois Supreme Court has yet to address this

issue and at least one federal court has opined that the Illinois Supreme Court would not apply a continuing tort theory in this manner. *See Rodrigue v. Olin Employees Credit Union,* 406 F.3d 434, 443 (7th Cir.2005) (interpreting Illinois law and concluding, in relevant part, that "a cause of action for conversion arose each time Wiltshire cashed or deposited one of the checks she had embezzled").

11. The full text of W. Va.Code § 46–3–118(g) states:

Unless governed by other law regarding claims for indemnity or contribution, an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty or (iii) to enforce an obligation, duty, or right arising under this article and not governed by this section must be commenced within three years after the cause of action accrues.

an audible distinction to be made between the article "a" and the word it precedes. *Id.* Consequently, the resolution of this appeal turns on an interpretation of the article "a." "A" is defined as an article which is "used as a function word before most *singular* nouns other than proper and mass nouns when the individual in question is undetermined, unidentified, or unspecified...." *Id.* at 1 (emphasis added). *State v. Kidd*, 562 N.W.2d 764, 765 (Iowa 1997) (footnote omitted) (concluding that, "[t]he statutory language defining the unit of prosecution under section 724.3 is 'an offensive weapon.' ... Based on the ordinary meaning of the word 'an,' as ascertained from the dictionary, we think the statute refers to possession of a single offensive weapon."). *See also State ex rel. Fatzer v. Martin*, 175 Kan. 160, 162–63, 258 P.2d 1000, 1002 (1953) ("The legislature in using the word 'an' was following the ordinary grammatical construction as the use of 'a' could not have been proper inasmuch as it preceded a word commencing with a vowel, and only the words 'an' or 'any' would have been proper. Moreover, it is apparent that the legislature intended it to have a singular meaning because it referred to 'said city' in the singular on two subsequent occasions in the proviso."). Accordingly, applying the theory of a continuing tort to causes of action governed by the limitations period set out in W. Va.Code § 46–3–118(g) would be contrary to the legislative intent plainly expressed therein.

Insofar as the Legislature has plainly expressed its intention that each act of conversion be treated as a separate violation for limitations purposes, it rationally follows that a cause of action for the conversion of a negotiable instrument accrues at the time the check is negotiated. *See* Syl. pt. 1, in part, *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992) ("a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs ...."). *See also Auto–Owners Ins. Co. v. Bank One*, 852 N.E.2d 604, 612 (Ind.Ct.App.2006) ("When the property converted is a negotiable instrument, the damage is done, and the tort is complete when the instrument is negotiated...."); *New Jersey Lawyers' Fund for Client Protection v. Pace*, 374 N.J.Super. 57, 67, 863 A.2d 402, 408 (2005) ("[W]e are satisfied that we should follow the vast majority of courts in this country that have uniformly held that the cause of action against a bank in a conversion action with respect to negotiable instruments accrues at the time of conversion....").

## C. Purpose and Policy of UCC

Finally, we believe that applying a continuing tort theory to the conversion of negotiable instruments is contrary to the purposes of and policy behind the UCC. W. Va.Code § 46–1–103 (2006) (Supp.2006) expressly states that:

(a) This chapter must be liberally construed and applied to promote its underlying purposes and policies, which are:

(1) To simplify, clarify and modernize the law governing commercial transactions;

(2) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and

(3) To make uniform the law among the various jurisdictions.

One court, rejecting the application of another equitable tolling rule, the discovery rule, explained

the commercial policies underlying the Uniform Commercial Code ... militate strongly against open-ended liability on negotiable instruments. As the Third Circuit explained:

[T]he utility of negotiable instruments lies in their ability to be readily accepted by creditors as payment for indebtedness. Checks must be transferable. Consequently, "in structuring the law of checks, we ... seek to enhance the negotiability of commercial paper so that it may play its role as a money substitute." Robert Hillman, et al., *Common Law and Equity Under the Uniform Commercial Code*, P 14.01[1] (1985). Negotiability requires predictable and rapid collection through payment channels.

Closely related to negotiability are commercial finality and certainty. "The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of

instruments on which commercial welfare so heavily depends." *Fuscellaro v. Industrial Nat'l Corp.,* 117 R.I. 558, 368 A.2d 1227, 1231 (1977); [statutory citation omitted].

. . . .

The Code drafters sought quick and inexpensive resolution of commercial disputes. This overarching goal is particularly important with negotiable instruments where the exigencies of commerce require inexpensive, quick, and reliable transfer of funds. When the only legally significant temporal events are the time of injury and the time of filing, the issue whether the statute of limitations bars an action becomes a relatively simple determination capable of resolution on the basis of judicial pleadings.

*Menichini* [*v. Grant*], 995 F.2d [1224,] 1230–31 [ (3d Cir.1993) ]; *see also Haddad's of Illinois, Inc.* [*v. Credit Union 1 Credit Union* ], 286 Ill.App.3d 1069, 222 Ill.Dec. 710, 678 N.E.2d [322,] 326 [ (1997) ] ("The use of negotiable instruments was intended to facilitate the rapid flow of commerce. This policy is best served by finding the accrual of a cause of action for conversion of negotiable instruments occurs when the instrument is negotiated."); *Husker News Co.* [*v. Mahaska State Bank* ], 460 N.W.2d [476,] 479 [ (Iowa 1990) ] ("Strict application of the limitation period, while predictably harsh in some cases, best serves the twin goals of swift resolution of controversies and 'certainty of liability' advanced by the [Code].").

*Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 622–23 (Tenn.2002). We find this rationale equally persuasive in the present context; therefore, we conclude that applying a continuing tort theory to the conversion of negotiable instruments is contrary to the purposes of and policy behind the UCC.

### D. Holdings

Based upon the foregoing discussion, we now expressly hold that, the equitable tolling theory of continuing torts does not apply to the conversion of multiple, separate negotiable instruments. We further hold that, in an action alleging conversion of multiple, separate negotiable instruments, and governed by the three-year limitations period set out in W. Va.Code § 46–3–118(g) (1993) (Repl.Vol.2001), the cause of action accrues and the limitations period begins to run from the date of the negotiation of each separate instrument.

### IV.

### CONCLUSION

Applying the foregoing holding to the certified questions herein presented, we answer them as follows:

In a case governed by the three year limitations period provided for in West Virginia Code 46–3–118(g):

(a) Does the continuing tort theory apply to the alleged conversion of multiple, separate negotiable instruments made payable to the plaintiff's business by an employee of plaintiff to her personal checking account at defendant bank over a period of several years, such that the cause of action accrues at, and the statute of limitations does not begin to run until, the date of the alleged conversion of the last negotiable instrument, permitting damage claims for instruments allegedly converted more than three years prior to the filing of the complaint, or

Answer: No.

(b) Does the cause of action accrue and the limitations period run from the date of the negotiation of each separate instrument permitting damage claims only for such instruments allegedly converted within such three year period prior to the filing of the complaint?

Answer: Yes.

Certified questions answered.

STARCHER, J., dissenting.

The majority opinion makes law that will let wrongdoers get off scot-free. Accordingly, I dissent.

For purposes of this case, we are required to assume that Wesbanco ("the bank") was sloppy and careless or worse, and "looked the other way" while Doris Hickerson defrauded

her employer. We are also required to assume that the bank engaged in this misconduct for seven years and never corrected its continuing conduct.[1]

The statute of limitations can sometimes help a person who stops doing bad things. But it's another matter when a wrongdoer repeats those bad acts over and over, and then, when caught, tries to plead the statute of limitations to escape accountability for the earlier actions that have continued unabated.

The majority opinion presents the reader with exactly *one* case that supports its counter-sensical holding—and *two* that do not. This is not exactly "persuasive authority."

Moreover, the majority opinion confuses apples and oranges. The opinion recognizes that the continuing tort theory establishes that the statute of limitations begins to run on the date of the most recent injury or instance of misconduct. Then, the opinion leaves the continuing tort theory hanging, and then discusses "equitable tolling," which *suspends the running* of the statute of limitations, an entirely different issue. The majority opinion doesn't seem to appreciate this simple distinction, leading to a confusing holding at best.

In the instant case, one can apply the continuing tort theory to claim that the most recent "conversion" by the bank was when the statute of limitations began to run. But one may also view the case as one where fraudulent concealment or similar conduct by the bank "equitably tolled" the statute of limitations which had begun running at each of the earlier episodes. It's unclear what the majority opinion means on these two different issues; but either way, the bank should not be able to get away with alleged misconduct when they never stopped engaging in it.

As to the "statutory construction" discussion in the majority opinion, it strains to produce a gnat. The drafters of the UCC did not clearly demonstrate the intent to allow a bank to sleep on its customers' rights

for years and then escape accountability on a technicality.

Finally, the plaintiff Copier Word Processing may have been just as negligent as Copier says the bank was—which is probably the unspoken reason behind the result arrived at by the majority opinion. But from a legal point of view, that comparison is to be made at a trial, before a jury—not by a court that goes out of its way to express its appreciation of the role played by the West Virginia Association of Community Bankers and the West Virginia Bankers Association "in determining the outcome of this case," *see* note 5.

Accordingly, I dissent.

ALBRIGHT, Justice, dissenting.

For the reasons set forth by Justice Starcher in his sensitive and legally correct dissenting opinion, I dissent from the judgment and the reasoning of the majority in this case.

---

1. Let me be clear that I do not accept as a *fact* that Wesbanco is a wrongdoer in the instant case. For all I know, Wesbanco did everything a bank should do with respect to their customer Copier Word Processing, and a jury might well so find. But in the posture of a motion to dismiss based on the statute of limitations, we must treat all of the allegations against Wesbanco as true.