689 S.E.2d 255

**Stanley W. DUNN, Jr., and Katherine B. Dunn, Plaintiffs Below, Appellants,**

v.

**Douglas S. ROCKWELL, Carol K. Rockwell, and Martin & Seibert, L.C., Defendants Below, Appellees.**

No. 34716.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 2009.

Decided Nov. 24, 2009.

James A. Varner, Sr., Esq., Debra Tedeschi Herron, Esq., McNeer, Highland, McMunn and Varner, L.C., Clarksburg, WV and William Francis Xavier Becker, Esq., Rockville, MD, for Appellants.

Christopher K. Robertson, Esq., Wendy Glover Adkins, Esq., Jackson Kelly PLLC, Martinsburg, WV, Attorneys for Appellee, Martin & Seibert.

Robert D. Aitcheson, Esq., Charles Town, WV, Attorney for Appellee, Carol Rockwell.

Kathy M. Santa Barbara, Esq., Santa Barbara Law Office Martinsburg, WV and Gregory H. Schillace, Esq., Schillace Law Office, Clarksburg, WV, Attorneys for Appellee, Douglas Rockwell.

KETCHUM, Justice:

In this appeal from the Circuit Court of Jefferson County we are asked to review two orders granting summary judgment to two defendants below: the law firm of Martin & Seibert, and Carol Rockwell. In both orders, the circuit court concluded that the statutes of limitation for the various causes of action alleged against both of the defendants had expired, and ruled that all of the causes of action against the two defendants were time-barred.

As set forth below, we affirm the circuit court's summary judgment order dismissing the causes of action against Martin & Seibert. However, we conclude that questions of material fact exist for the finder of fact to resolve regarding whether the statutes of limitation on five of the causes of action alleged against Carol Rockwell had expired, and conclude that there is no statute of limitation applicable to two equitable causes of action alleged against Ms. Rockwell. We therefore reverse the circuit court's summary judgment order as to her.

I.

*Facts and Background*

This case concerns an undeveloped 6.87 acre tract of land on the shore of the Shenandoah River in Jefferson County. The appellants and plaintiffs-below, Stanley and Katherine Dunn, had a written option to purchase approximately 460 acres of farmland which encompassed the 6.87 acre tract. However, the Dunns claim that the lawyer who drafted the written option—appellee and defendant-below Douglas S. Rockwell ("Lawyer Rock-

well")—improperly purchased the 6.87 acre tract and concealed the extent of the purchase from the Dunns. The question we are asked to resolve is whether all or part of the Dunns' lawsuit—against Lawyer Rockwell's wife, appellee and defendant-below Carol Rockwell, and against Lawyer Rockwell's former law firm, appellee and defendant-below Martin & Seibert—regarding the 6.87 acre tract is barred by any statutes of limitation.

In 2001, Hugh N. Hoover and his sister, Dianna Hoover Gray, owned approximately 460 acres of contiguous farmland in Jefferson County which bordered the Shenandoah River. In December 2001, Carol Rockwell, received title from Mr. Hoover and Ms. Gray to a three-acre parcel of that farmland along the Shenandoah River.

In 2002, the Dunns began negotiating with Hugh Hoover to purchase the remaining Hoover/Gray farmland. Mr. Dunn could not yet afford to purchase the farmland, and so he hired his friend, Lawyer Rockwell, to draft an agreement giving the Dunns the exclusive option to purchase the farmland. At that time—and until March 2004—Lawyer Rockwell was employed at the law firm of Martin & Seibert in Charles Town, West Virginia. Lawyer Rockwell drafted the option agreement and gave it to Mr. Dunn.

On June 27, 2002, Stanley Dunn and Hugh Hoover executed the option, which permitted the Dunns to buy "460 acres more or less by survey" of the Hoover/Gray farmland for $6,000.00 per acre. The property subject to the option surrounded the three-acre parcel bought by the Rockwells in 2001. The 2002 option agreement was set to expire 12 months from the date it was executed.

In November or December 2002, Lawyer Rockwell and his wife sought to buy additional land surrounding their three-acre parcel. Knowing that the land was subject to Mr. Dunn's June 27, 2002 option—the three-acre parcel was bordered on one side by the river and the other three sides by the Hoover/Gray farmland—Lawyer Rockwell orally asked Mr. Dunn if he could buy some of the optioned acreage from Mr. Hoover and Ms. Gray in order to "square up" or "round off" his three-acre parcel. Mr. Dunn agreed, and

later told Hugh Hoover that this was acceptable.

In December 2002, a surveyor prepared a map of the acreage that Lawyer Rockwell and his wife sought to purchase out of the optioned property. The map designated a 6.87 acre tract that squarely surrounded the Rockwells' three-acre residential lot, but which also extended north in a panhandle or dogleg along the Shenandoah riverbank approximately 115 feet wide and 589 feet long. The Rockwells paid with two checks—one from Carol Rockwell and the other from Lawyer Rockwell—and on December 27, 2002, the 6.87 acre tract was deeded solely to Ms. Rockwell. The closing on the Rockwells' acquisition of the 6.87 acre tract was handled at the Martin & Seibert law offices.

The Dunns allege that they never agreed that the Rockwells could purchase the 589-foot long strip fronting the Shenandoah River. The Dunns also assert that Lawyer Rockwell never advised them, orally or in writing, of the survey, the purchase or the precise size and location of the 6.87 acre tract. The Dunns also assert that Lawyer Rockwell never advised them that they should seek independent advice to protect themselves with regard to the Rockwells' December 2002 purchase.

In March 2003, Mr. Dunn asked Lawyer Rockwell to draft an extension for the 2002 option to purchase, which Lawyer Rockwell did. The written extension made no mention of the 6.87 acre tract that had been deeded to Lawyer Rockwell's wife, nor did it exclude the 6.87 acre tract from the new option. The extension extended the option end date from June 27, 2003 to August 1, 2003, when the option expired without Mr. Dunn purchasing the property. However, Mr. Dunn asserts that he and Mr. Hoover and Ms. Gray continued negotiating toward a purchase as though the option were still in effect.

Sometime during the Summer of 2003, Mr. Dunn and Mr. Hoover negotiated a new option agreement which was also drafted by Lawyer Rockwell. The option agreement was for a 24-month period, and raised the price to $6,500.00 per acre "which the parties estimate shall contain approximately 500

acres." Again, the Rockwells' 6.87 acre tract was not excluded from the new option written by Lawyer Rockwell. Mr. Dunn and Mr. Hoover signed the agreement on August 26, 2003, and Mr. Dunn tendered a check for $50,000.00 in exchange for the option.

It was during this time period, in mid-2003, that events occurred giving rise to the Dunns' statute of limitation problems and to the instant appeal.

At the north edge of the 589–foot dogleg of river front land bought by the Rockwells there was an unrelated parcel of land owned by Mr. Hoover and Ms. Gray—but not subject to the Dunn option—with a house. In July 2003, Henry and Dale Walter bought the parcel and house. The house, however, was exposed to flooding from the river and the Walters wanted additional land to build above the flood plain.

Sometime in August or September 2003, Hugh Hoover approached Mr. Dunn seeking permission to sell some of the land surrounding the Walters' tract—land which was subject to the Dunns' exclusive option to purchase—to the Walters. Mr. Dunn says he responded (with emphasis added):

> I told him I had no problem with him adding onto the back of it, it was just a rough hillside. But I told him, also, that I did not want to give him anything between the two, the Rockwell property . . . and that house. And he looked at me real funny and said, *well, Stanley, Doug [Rockwell] has already taken that* . . . .

As we relate in greater detail in the discussion, *infra*, by no later than September 29, 2003, the Dunns learned that the Rockwells had purchased river front property subject to the 2002 option that not only "squared up" their three-acre property, but which extended far from their residence along the Shenandoah River. The Dunns state they did not conduct further investigation of the size or location of the Rockwells' purchase at that time, partly because they did not want to upset Mr. Hoover and Ms. Gray and lose the opportunity to purchase the Hoover/Gray farmland, and partly because they feared that Lawyer Rockwell might steer the Hoover/Gray farmland to another buyer.

Lawyer Rockwell stopped working for defendant Martin & Seibert on March 31, 2004. The Dunns, however, contend that in the Spring of 2005, Mr. Dunn asked Lawyer Rockwell to prepare another extension agreement relating to the 2003 option. Lawyer Rockwell prepared the extension agreement for Mr. Dunn (but the agreement was never executed).

In late 2005, the Dunns were financially able to purchase the Hoover/Gray farmland. On October 27, 2005, the Dunns closed on the purchase of the Hoover–Gray farmland. The Dunns allege that at the closing, for the first time, they saw the December 27, 2002, deed to Carol Rockwell for the 6.87 acre tract with an accompanying survey plat showing the 589–foot dogleg along the Shenandoah River. The Dunns contend that this is when they first learned of the survey and the precise size and location of the Rockwells' acquisition of land that was subject to the 2002 option.

The Dunns and the Rockwells then engaged in several discussions and exchanged correspondence about the 6.87 acre tract. When the Rockwells refused to give any portion of the tract to the Dunns (the Dunns appear to have offered the Rockwells the purchase price they paid plus interest), on August 21, 2006, the Dunns filed this lawsuit against the Rockwells and the Martin & Seibert law firm.

After extensive discovery, the parties filed various motions and counter-motions for full or partial summary judgment.

In an order dated June 19, 2008, the circuit court granted summary judgment to the law firm of Martin & Seibert. In a separate order, dated August 15, 2008, the circuit court granted summary judgment to Carol Rockwell. The circuit court concluded that the causes of action against Martin & Seibert and against Carol Rockwell were governed by a two-year statute of limitation. The circuit court found that it was undisputed that the Dunns knew or reasonably should have known, by September 29, 2003, that the Rockwells had engaged in some form of misconduct which caused the Dunns some sort of harm. Nevertheless, the Dunns did not file

**50**

their lawsuit until August 2006.[1] The circuit court therefore ruled that the plaintiffs' causes of action were time barred.

The Dunns now appeal the circuit court's June 19, 2008, and August 15, 2008, summary judgment orders.

## II.

### Standard of Review

■ As we stated in Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), we review a circuit court's entry of summary judgment *de novo*.

## III.

### Discussion

The Dunns contend on appeal that the circuit court erred in granting summary judgment to the Martin & Seibert law firm and to Carol Rockwell on statute of limitation grounds. The Dunns argue that statutes of limitation do not apply to the equitable causes of action they allege in their complaint. The Dunns also assert that they are entitled to have a jury determine whether the statutes of limitation on their remaining causes of action were tolled by the discovery rule.

"Generally, the statute of limitations begins to run when a tort occurs; however, under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 711, 487 S.E.2d 901, 906 (1997). The discovery rule recognizes "the inherent unfairness of barring a claim when a party's cause of action could not have been recognized until after the ordinarily applicable period of limitation." *Harris v. Jones*, 209 W.Va. 557, 562, 550 S.E.2d 93, 98 (2001). In *Gaither v. City Hospital*, we discussed the common-law evolution of the discovery rule and its case-by-case extension to various areas of tort law. 199 W.Va. at 711–712, 487 S.E.2d at 906–907. We noted that in 1992 we had abandoned our case-by-case extension,

and held that the discovery rule is "generally applicable to all torts, unless there is a clear statutory prohibition of its application." Syllabus Point 2, *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992).

In our cases we have articulated two conflicting definitions of the discovery rule. In Syllabus Point 4 of *Gaither v. City Hosp., Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997), we adopted the following definition:

> In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

This articulation of the discovery rule "tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury." 199 W.Va. at 714, 487 S.E.2d at 909.

■ A competing definition of the discovery rule was propounded in *Cart v. Marcum, supra*. In Syllabus Point 1 of *Cart*, we adopted the standard, common-law definition of the discovery rule that had been used in prior cases, stating that:

> Generally, a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under the "discovery rule," the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim.

However, *Cart* then severely constrained that definition, holding in Syllabus Point 3 that:

> Mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations; the "discovery

---

1. On October 24, 2008, the circuit court entered an order denying summary judgment for Douglas Rockwell. Although that order is not on appeal,

Mr. Rockwell has filed a brief urging that the Court affirm the circuit court's rulings in favor of his wife and his former law firm.

rule" applies only when there is a strong showing by the plaintiff that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.

Under this latter articulation of the discovery rule, we stated that "mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of a statute of limitations. In order to benefit from the rule, a plaintiff must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship[.]" 188 W.Va. at 245, 423 S.E.2d at 648.

We have examined the application of these competing versions of the discovery rule and find that this Court, the trial courts, and litigants have struggled to apply them with any analytical consistency. *See, e.g., Merrill v. West Virginia Dept. of Health and Human Resources*, 219 W.Va. 151, 156, 632 S.E.2d 307, 312 (2006) (*per curiam* ) ("A studious observer will note that this Court stated one form of the discovery rule in *Cart v. Marcum*, and then stated a different, more lenient form of the discovery rule in *Gaither v. City Hospital* [.]"). One court begins by applying the discovery rule espoused in *Cart v. Marcum*[2], another begins with the discovery rule espoused in *Gaither v. City Hospital*[3], while a third will find a plaintiff's cause of action is barred by a statute of limitation without any mention of either variation of the discovery rule.[4]

We have examined our cases expounding upon the discovery rule which pre-date *Cart* and *Gaither*,[5] and find that Syllabus Point 3 of *Cart* is an aberration in our jurisprudence. Prior to *Cart*, our cases universally stated the discovery rule in simple terms: a plaintiff's duty to file suit is not triggered until the plaintiff knows, or by the exercise of reasonable diligence should have known, of a cause of action against the defendant. The *Cart* decision, without any substantive analysis, limited the discovery rule exclusively to cases where the defendant engaged in some fraud and concealed the cause of action from the plaintiff. As one commenter noted, "the court's opinion in *Cart* inexplicably muddies the clear evolution of the discovery rule[.]"

**2.** *See Miller v. Monongalia County Bd. of Educ.*, 210 W.Va. 147, 152, 556 S.E.2d 427, 432 (2001) (when a "cause of action accrues during a victim's infancy and the injured person alleges in his or her complaint that the wrongdoer fraudulently concealed material facts," the statute of limitation is tolled.)

**3.** *See* Syllabus Point 8, *Bradshaw v. Soulsby*, 210 W.Va. 682, 558 S.E.2d 681 (2001) (adopting *Gaither* in wrongful death actions, and holding "In a wrongful death action, under the discovery rule, the statute of limitation contained in *W.Va. Code*, 55-7-6(d) [1992] begins to run when the decedent's representative knows or by the exercise of reasonable diligence should know (1) that the decedent has died; (2) that the death was the result of a wrongful act, neglect, or default; (3) the identity of the person or entity who owed the decedent a duty to act with due care and who may have engaged in conduct that breached that duty; and (4) that the wrongful act, neglect or default of that person or entity has a causal relation to the decedent's death.").

**4.** *See, e.g., Copier Word Processing Supply, Inc. v. WesBanco Bank, Inc.*, 220 W.Va. 39, 640 S.E.2d 102 (2006) (Although plaintiff-employer filed suit 5 months after discovering that an employee had converted 721 checks and embezzled funds for almost 12 years, the parties and the trial court focused their analysis solely upon whether the three-year statute of limitation was tolled by the continuous tort doctrine—that is, whether the wrongful negotiation of each check was a continuous tort, or a series of separate torts. The trial court found the negotiation of each check was a separate tort, and barred the plaintiff from recovering damages for any check wrongfully negotiated more than three years before suit was filed. The opinion notes, in footnote 6, that it was only before this Court that the plaintiff raised the discovery rule.)

**5.** *See* Syllabus Point 4, *Petrelli v. West Virginia–Pittsburgh Coal Co.*, 86 W.Va. 607, 104 S.E. 103 (1920) (discovery of underground mine on property); *Morgan v. Grace Hospital, Inc.*, 149 W.Va. 783, 144 S.E.2d 156 (1965) (discovery of an object left behind in surgery); *Hundley v. Martinez*, 151 W.Va. 977, 988, 158 S.E.2d 159, 166 (1967) (same); *Family Savings & Loan, Inc. v. Ciccarello*, 157 W.Va. 983, 207 S.E.2d 157 (1974) (discovery of legal malpractice), *overruled on other grounds, Hall v. Nichols*, 184 W.Va. 466, 400 S.E.2d 901 (1990); Syllabus Point 2, *Hill v. Clarke*, 161 W.Va. 258, 241 S.E.2d 572 (1978) (discovery of medical malpractice); *Harrison v. Seltzer*, 165 W.Va. 366, 371, 268 S.E.2d 312, 314 (1980) (same); *Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987) (discovery of product liability actions); *Slack v. Kanawha County Housing and Redevelopment Authority*, 188 W.Va. 144, 423 S.E.2d 547 (1992) (discovery of an invasion of privacy).

*James R. Leach, "Cart v. Marcum: The Discovery Rule as an Exception to the Statute of Limitations in West Virginia,"* 96 W.Va. L.Rev. 1197, 1210 (1994).

In many jurisdictions, in addition to the discovery rule, courts have adopted a separate tolling doctrine that essentially estops a defendant who has fraudulently concealed a cause of action from raising a statute of limitation defense. In those jurisdictions, courts have held that the statute of limitation does not begin to run until discovery of a tort if the defendant has fraudulently concealed the tortious conduct from the plaintiff. "Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Trafalgar House Const., Inc. v. ZMM, Inc.,* 211 W.Va. 578, 584, 567 S.E.2d 294, 300 (2002). Syllabus Point 3 of *Cart* does not reflect the discovery rule, but rather reflects this fraudulent concealment tolling doctrine.

 We believe that the simplest way to eliminate the tension between these competing definitions of the discovery rule, and to clarify the application of the discovery rule to future cases, is to explicitly overrule *Cart v. Marcum* and its progeny and to restate our case law as it relates to the discovery rule. "Although this Court is loathe to overturn a decision so recently rendered, it is preferable to do so where a prior decision was not a correct statement of law." *Murphy v. Eastern American Energy Corp.,* 224 W.Va. 95, 101, 680 S.E.2d 110, 116 (2009).[6] As we said in *State v. Guthrie,* 194 W.Va. 657, 679 n. 28, 461 S.E.2d 163, 185 n. 28 (1995),

> [A] precedent-creating opinion that contains no extensive analysis of an important issue is more vulnerable to being overruled than an opinion which demonstrates that the court was aware of conflicting decisions and gave at least some persuasive discussion as to why the old law must be changed.

*Cart v. Marcum* substantially deviated from our prior decisions discussing the discovery

rule, yet contained no discussion, persuasive or otherwise, why the deviation was necessary. Accordingly, we now hold that *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992) and its progeny are hereby overruled.

To bring analytical clarity to the resolution of statute of limitation questions, we believe that courts should employ a step-by-step process that synthesizes the competing discovery doctrines. We first considered such a process in *Keesecker v. Bird,* 200 W.Va. 667, 490 S.E.2d 754 (1997), where we stated:

> The first step in analyzing any statute of limitation question is to determine the applicable statute.
>
> The second step in evaluating a statute of limitation question is to establish when the requisite elements of the alleged tort occurred . . .
>
> The next step is to determine whether the plaintiff is entitled to the benefit of the ameliorative effects of the discovery rule [as stated in *Gaither v. City Hospital*] . . . .
>
> The last step in the statute of limitation analysis is to determine if the limitation period is tolled by some misconduct of the defendant. . . . [I]n some circumstances causal relationships are so well established that we cannot excuse a plaintiff who pleads ignorance. In those instances where a cause of action should be patently obvious . . . the plaintiff cannot claim ignorance. The only way a plaintiff can toll the statute of limitation in such circumstances is to make a strong showing . . . that some action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.

200 W.Va. at 682–684, 490 S.E.2d at 769–771 (quotations and citations omitted).

 To formally clarify our case law, we now hold that the "discovery rule" is generally applicable to all torts, unless there is a clear statutory prohibition to its application.

 "In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limita-

---

**6.** *See also, Farley v. Sartin,* 195 W.Va. 671, 678, 466 S.E.2d 522, 529 (1995) (*"[S]tare decisis* does not require static doctrines but instead permits

law to evolve and to adjust to changing conditions and notions of justice as well as to varied sets of facts");

tions begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury." Syllabus Point 4, *Gaither v. City Hosp., Inc.,* 199 W.Va. 706, 487 S.E.2d 901 (1997). In most cases, the typical plaintiff will "discover" the existence of a cause of action, and the statute of limitation will begin to run, at the same time that the actionable conduct occurs.

■ We further hold that under the discovery rule set forth in Syllabus Point 4 of *Gaither v. City Hosp., Inc., supra,* whether a plaintiff "knows of" or "discovered" a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action.

■ Finally, a five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if material questions of fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of *Gaither v. City Hosp., Inc., supra.* Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine.[7] Only the first step is purely a question of law; the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact.

As we demonstrate below, the depth to which these five steps are analyzed is naturally dependent upon the procedural posture and facts of the case under review. And to reiterate: only the first step is a question of law for resolution by the trial court. The remaining steps generally involve mixed questions of law and fact, and a trial court is required to analyze mixed questions of law and fact (such as those raised in the present case) in order to determine "whether there is . . . [a] genuine issue of fact to be tried and inquiry concerning the facts is . . . desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y.,* 148 W.Va. 160, 133 S.E.2d 770 (1963). When the resolution of a step requires resolution of a genuine issue of material fact, the issue should be submitted to the finder of fact.

In this case, the plaintiffs filed a ten-count complaint against the three defendants.[8] The parties agree that only seven of the causes of action apply to defendants Douglas and Carol Rockwell, while the remaining three apply solely to the Martin & Seibert law firm. We will now analyze these various causes of action and the various statutes of limitation in the context of each defendant, to determine whether the circuit court was correct in its determination that there were no genuine issues of fact to be tried.

---

**7.** Examples of other tolling doctrines include the continuous representation doctrine (which relates to lawyers), the continuous treatment doctrine (which relates to physicians), or the continuous tort doctrine.

**8.** To be more specific, on August 21, 2006, the Dunns filed their initial complaint and alleged seven counts against the defendants. On April 16, 2007, the Dunns amended their complaint by "interlineation" and added three additional counts.

## A. Defendants Douglas and Carol Rockwell

The Dunns have asserted seven causes of action against the Rockwells: rescission, cancellation and reformation of a deed; unjust enrichment; misappropriation and conversion; fraud; professional negligence by Lawyer Rockwell; breach of fiduciary duty by Lawyer Rockwell; and civil conspiracy by both lawyer and Ms. Rockwell.

We understand that only the plaintiffs' case against Carol Rockwell is before the Court, as the circuit court's August 15, 2008, order only granted summary judgment on statute of limitation grounds to her. The case against Lawyer Rockwell is still pending before the trial court.

However, the causes of action against Lawyer Rockwell and Ms. Rockwell and the damages and equitable relief sought by Mr. and Ms. Dunn are so intertwined that we believe the interests of the Rockwells to be inseparable. Accordingly, even though only Ms. Rockwell is before the Court, our discussion must include the acts and omissions of both Lawyer Rockwell and Ms. Rockwell.

The first step in our analysis is to determine the proper statutes of limitation for each of the seven causes of action asserted against the Rockwells.

The first two causes of action—for rescission, cancellation and reformation of a deed, and for unjust enrichment—are both equitable causes of action. Both causes of action seek equitable relief. The plaintiffs seek to have the deed of 6.87 acres of land to Carol Rockwell in December 2002 rescinded and a corrected deed filed with the county clerk, and to have the Rockwells disgorged of any benefits and value they have received from (allegedly) unjustly taking possession and ownership of the river front property.

██ Our law is clear that there is no statute of limitation for claims seeking equitable relief. As we stated in Syllabus Point 1 of *Patrick v. Stark*, 62 W.Va. 602, 59 S.E. 606 (1907), "[s]tatutes of limitation are never applicable to causes of action falling within the exclusive jurisdiction of courts of equity." We said, to the same effect, in Syllabus Point 3, in part, of *Felsenheld v. Bloch Bros. Tobacco Co.*, 119 W.Va. 167, 192 S.E. 545 (1937), that "[s]tatutes of limitations are not applicable in equity to subjects of exclusively equitable cognizance." [9]

██ Moreover, we have specifically ruled that there is no statute of limitation for claims seeking to rescind a deed to land, and to account for rents and profits. In Syllabus Point 3 of *Laurie v. Thomas*, 170 W.Va. 276, 294 S.E.2d 78 (1982), we stated:

> Where a suit based on fraud is not for damages but seeks to rescind a writing or impose a trust or other equitable relief, it is not a common law action for fraud but is equitable in nature. Consequently, the doctrine of laches is applicable rather than any specific statute of limitations period.

Ms. Rockwell argues that if a lawsuit, like this case, involves causes of action in equity and others that arise in law, then a trial court is obligated to apply a statute of limitation to all of the causes of action. In her brief, Ms. Rockwell asserts that because the circuit court "was asked to resolve both legal and equitable claims together," then the equitable claims should be governed by a statute of limitation. As authority, Ms. Rockwell cites Syllabus Point 4 of *Bennett v. Bennett*, 92 W.Va. 391, 115 S.E. 436 (1922), which states:

9. *See also, Province v. Province*, 196 W.Va. 473, 482, 473 S.E.2d 894, 903 (1996) ("in absence of a specific statute of limitations, West Virginia firmly is committed to the rule that statutes of limitations do not apply to claims exclusively of an equitable nature."); *West Virginia Human Rights Commission v. Garretson*, 196 W.Va. 118 n. 8, 468 S.E.2d 733 n. 8 (1996) (in matters of equity "[o]ther time restraints may be relevant in determining the extent to which a claimant is entitled to equitable remedies"); *Rodgers v. Rodgers*, 184 W.Va. 82, 399 S.E.2d 664 (1990) (in claims of equity, "the claim would appear to be an equitable one controlled by the doctrine of laches rather than by a statute of limitations."); Syllabus Point 5, *Marinack v. Blackburn*, 93 W.Va. 585, 116 S.E. 7 (1923) ("Against such a debt, of which equity has exclusive jurisdiction, the statute of limitations never runs."); *Depue v. Miller*, 65 W.Va. 120, 64 S.E. 740 (1909) ("The statute of limitations never runs against a right, the vindication of which belongs to the exclusive jurisdiction of the equity courts.").

Where there is concurrent jurisdiction in law and equity for the assertion of claims, equity will apply the statute of limitations as a bar to such claims, following the law, and will recognize and apply exceptions to the running of the statute.

We do not, however, think that *Bennett* means what Ms. Rockwell thinks that it means. To understand Syllabus Point 4 of *Bennett* requires an understanding of *Bennett's* facts.

In *Bennett,* the plaintiff (and her husband) owned land that was being auctioned to satisfy an unpaid deed of trust. In 1887, the plaintiff convinced the defendant (her husband's brother) to buy the land at auction. The parties agreed that when the land was sold in the future, the parties would split the profits. However, between 1898 and 1905 the defendant sold the mineral rights to the land, and sold the surface rights in 1910, all for a substantial profit, and never shared the profits with the plaintiff When the plaintiff approached the defendant in 1911 seeking her share of the profits, the defendant refused to pay. The plaintiff waited seven years, until 1918, to file her lawsuit.

The Court found that, on these facts, an express trust was created in 1887 whereby the defendant held the plaintiff's share of the profits in trust. The Court further found that no statute of limitation applied while the trust was in effect, or while the plaintiff believed the trust was still in effect. 92 W.Va. at 398, 115 S.E. at 438. However, once the plaintiff discovered in 1911 that the defendant was refusing to live up to his end of the bargain—that is, that he was repudiating the trust—the Court believed that a stat-ute of limitation was triggered. As the Court stated, "[n]either the statute of limitations nor laches will apply to an express trust until there is a denial or repudiation of the trust, of which the beneficiary has notice; after that time the statute begins to run[.]" *Id.* The Court went on to find that the plaintiff's claim was governed by a 10–year statute of limitation, and found that the claim had been filed timely.

■ *Bennett's* central holding is that as long as a trust—a creation of equity—is in existence, no statute of limitation applies; once the trust is repudiated or terminated, and a litigant seeks damages against the trustee at law, then the statutory limitation period applies.[10] Read in light of its facts, *Bennett* does not mean that if a lawsuit involves causes of action in equity and other causes of action arising in law, then a trial court is obligated to apply a statute of limitation. Instead, Syllabus Point 4 of *Bennett* should be read to say that if *a* particular cause of action sounds in both equity and law, then a trial court should apply a statute of limitation to *that* particular cause of action. Likewise, if a lawsuit involves causes of action that sound in equity, and other causes of action in law, only the causes of action sounding in law would be subject to statutes of limitation. Read in this way, it is clear that *Bennett* is inapplicable to the instant case.

■ Accordingly, we believe that in this case, the Dunns' two equitable causes of action are not governed by any statute of limitation. Our analysis on these two causes of action is at an end, and we need not consider the remaining steps in our five-step analysis.[11]

---

**10.** Numerous other cases reach the same conclusion. *See, e.g., Vorholt v. One Valley Bank,* 201 W.Va. at 483, 498 S.E.2d at 244 ("[T]he statute of limitations is tolled only so long as the trust continues, so that once the trust ceases, the statute of limitations begins to run."); Syllabus Point 2, *Crawford v. Caplinger,* 110 W.Va. 498, 158 S.E. 717 (1931) ("Where there is an express trust, ordinarily laches cannot be imputed to the beneficiary until the trustee repudiates the trust, and such repudiation is communicated to the beneficiary. Nor will the statute of limitations begin to run until such repudiation and notice occurs."); Syllabus Point 3, *Currence v. Ralphsnyder,* 108 W.Va. 194, 151 S.E. 700 (1929) ("The statute of limitations does not run against an express trust

until the beneficiary has notice that the trustee has repudiated the trust."); *Van Winkle v. Blackford,* 33 W.Va. 573, 583, 11 S.E. 26, 29 (1890) ("The law is too well settled to make any reference to authority necessary, that, when a trustee does an act which purports to be a termination of his trust, it gives currency to the statute from the time of such an act.... When the act purports to be a complete termination of the trust, he henceforth holds adversely, and at the end of the statutory period all further account is barred.").

**11.** This is not to say that there is no time limit for filing an equitable cause of action. The one

The next four causes of action filed by the Dunns—for misappropriation and conversion; fraud; professional negligence; and breach of fiduciary duty—are governed by the two-year statute of limitation found in *W.Va. Code,* 55–2–12 [1959].[12] *See, e.g., Cart v. Marcum,* 188 W.Va. at 243, 423 S.E.2d at 646 ("The statute of limitation for this type of tort [conversion] is two years."); *Brown v. Community Moving & Storage, Inc.,* 193 W.Va. 176, 178 n. 3, 455 S.E.2d 545, 547 n. 3 (1995) (*per curiam* ) ("The two-year statute of limitations period set forth in W.Va.Code, 55–2–12 (1959), is applicable to the fraud claim[.]"); *Trafalgar House Const., Inc. v. ZMM, Inc.,* 211 W.Va. 578, 583, 567 S.E.2d 294, 299 (2002) ("[C]laims in tort for negligence, professional negligence, and misrepresentation (fraudulent or negligent) are governed by a two-year statute of limitation."); *Vorholt v. One Valley Bank,* 201 W.Va. 480, 486, 498 S.E.2d 241, 247 (1997) (applying the "catch-all" periods of limitation in *W.Va. Code,* 55–2–12 to action for breach of fiduciary duty).

The seventh and final cause of action filed by the Dunns against the Rockwells is for civil conspiracy. "The law of this State recognizes a cause of action sounding in civil conspiracy." *Kessel v. Leavitt,* 204 W.Va. 95, 128, 511 S.E.2d 720, 753 (1998). At its most fundamental level, a "civil conspiracy" is "a combination to commit a tort." *State ex rel. Myers v. Wood,* 154 W.Va. 431, 442, 175 S.E.2d 637, 645 (1970). We defined a civil conspiracy in *Dixon v. American Indus. Leasing Co.,* 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (1979):

> [A] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

We went on to hold, in Syllabus Point 1, in part, of *Dixon* that "[i]n order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act

---

defense that the parties tangentially discussed before this Court is the doctrine of laches. One of the substantive distinctions between statutes of limitations and laches is that "[l]aches applies to equitable demands[,] where the statute of limitation does not." Syllabus Point 2 (in part), *Condry v. Pope,* 152 W.Va. 714, 166 S.E.2d 167 (1969). *See also,* Syllabus Point 3, in part, *Laurie v. Thomas,* 170 W.Va. 276, 294 S.E.2d 78 (1982) ("[T]he doctrine of laches is applicable rather than any specific statute of limitations period.").

Laches is "delay which operates prejudicially to another person's rights." *Carter v. Carter,* 107 W.Va. 394, 148 S.E. 378 (1929). As we said in Syllabus Point 1 of *State ex rel. Smith v. Abbot,* 187 W.Va. 261, 418 S.E.2d 575 (1992):

> Mere delay will not bar relief in equity on the ground of laches. "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." Syllabus Point 2, *Bank of Marlinton v. McLaughlin,* 123 W.Va. 608, 17 S.E.2d 213 (1941).

"This Court has consistently emphasized the necessity of a showing that there has been a detrimental change of position in order to prove laches[.]" *Maynard v. Board of Educ. of Wayne County,* 178 W.Va. 53, 59, 357 S.E.2d 246, 253 (1987). *See also,* Syllabus Point 3, *Carter v. Price,* 85 W.Va. 744, 102 S.E. 685 (1920) ("Where a party knows his rights or is cognizant

of his interest in a particular subject-matter, but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. This disadvantage may come from death of parties, loss of evidence, change of title or condition of the subject-matter, intervention of equities, or other causes. When a court of equity sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.")

Because the parties did not raise the defense of laches in the trial court in the first instance, and have not briefed its application here, we decline to give further discussion to the issue.

12. *W.Va.Code,* 55–2–12 [1959] states:

> Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

in an unlawful manner to the injury of the plaintiff[.]" *In accord,* Syllabus Point 7, *Cook v. Heck's Inc.,* 176 W.Va. 368, 342 S.E.2d 453 (1986). *See also, Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994) ("Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means.").

■ A civil conspiracy is not a *per se,* stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s). *Kessel v. Leavitt,* 204 W.Va. 95, 129, 511 S.E.2d 720, 754 (1998). *See also, Gulf Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W.2d 83, 102 (Tex.App.1985), *reversed on other grounds by Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762 (Tex. 1987) ("The gist of a civil conspiracy is the damage resulting from commission of a wrong that injures another and not the conspiracy itself. Thus an actionable civil conspiracy must consist of wrongs that would have been actionable against the conspirators individually."); *Fitzgerald v. Seamans,* 384 F.Supp. 688, 693 (D.D.C.1974) ("[A] civil conspiracy is not in itself actionable, but rather, it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action."); *Roche v. Blair,* 305 Mich. 608, 614, 9 N.W.2d 861 (1943) ("The conspiracy standing alone without the commission of acts causing damage would not be actionable. The cause of action does not result from the conspiracy but from the acts done."). As the Wisconsin court of appeals once stated,

> A conspiracy may produce one or more torts. If it does, then every conspirator is liable for that tort, including a conspirator who promoted but did not commit the tort. A conspiracy is not, itself, a tort. It is the tort, and each tort, not the conspiracy, that is actionable.

*Segall v. Hurwitz,* 114 Wis.2d 471, 481, 339 N.W.2d 333, 338 (Wis.App.1983) (citations omitted).

■ Accordingly, we hold that the statute of limitation for a civil conspiracy claim is determined by the nature of the underlying conduct on which the claim of conspiracy is based—which, as we have just held in this case, is two years. *See* 16 Am. Jur. 2d "Conspiracy" § 65 [2009] ("the statute of limitations applicable to civil conspiracy is that applicable to the underlying wrong."); 12 Cal. Jur. 3d "Civil Conspiracy" § 11 ("Because there is no cause of action for conspiracy in and of itself, the statute of limitations is determined by the nature of the action in which the conspiracy is alleged or appears."). *See also, Terlecki v. Stewart,* 278 Mich.App. 644, 754 N.W.2d 899 (2008) ("the gravamen of the action is not the conspiracy but the wrongful act. Consequently, an allegation of conspiracy is "superfluous" as far as determining the applicable statute of limitations. It follows that the conspiracy claim takes on the limitations period for the underlying wrong that was the object of the conspiracy. Further, it is the wrongful act, not the agreement to commit a wrongful act, that commences the running of the limitations period."); *Segall v. Hurwitz,* 114 Wis.2d at 481 n. 2, 339 N.W.2d at 338 n. 2 ("Identifying the wrong should be the proper approach to fixing the date the cause of action accrues for purposes of the statute of limitations."); *Auld v. Mobay Chemical Co.,* 300 F.Supp. 138, 140 (D.C.Pa.1969) ("the applicable period of limitation is the state statute of limitation on the overt act"); *Kenworthy v. Brown,* 248 Cal.App.2d 298, 301, 56 Cal.Rptr. 461, 463 (1967) ("There is no cause of action for civil conspiracy itself; an actionable wrong that is the *subject* of the conspiracy must be alleged in order to state a cause of action. . . . In any action based on a civil conspiracy the statute of limitations is determined by the *nature* of the action in which the conspiracy is alleged.")

With the limitation periods for these five causes of action in mind, we turn to the next steps in our analysis: determining when the requisite elements of the causes of action occurred, and when the statutes of limitation began to run.

Mr. Dunn concedes that in late 2002 he gave Lawyer Rockwell permission to buy

some of the Hoover/Gray farmland subject to the option to "round off" or "square up" his adjacent three-acre tract. The Dunns assert that they had no idea that the Rockwells would buy more land than needed to "round off" or "square up" their three-acre tract, nor any idea the Rockwells would buy a dogleg strip of land that fronted 589 feet on the Shenandoah River. Furthermore, the Dunns argue that Lawyer Rockwell had a duty to tell them he had made the purchase of the 6.87 acre tract, to tell them what he had purchased, and a duty to inform them they had a right to seek the advice of another lawyer to protect them regarding his proposed purchase.

The acts giving rise to the plaintiffs' causes of action occurred in December 2002, when defendants Douglas and Carol Rockwell purchased the 6.87 acre tract from Mr. Hoover and Ms. Gray, and titled the deed in Ms. Rockwell's name. There are clear material questions of fact in the record regarding whether the Dunns were aware of the extent of the Rockwell's purchase in 2002, and thereby aware of the Rockwells' alleged misconduct.

The record, however, appears just as clear that by September 29, 2003, the Dunns knew that they had been harmed by the Rockwells. In the Summer of 2003, Hugh Hoover asked Mr. Dunn for permission to sell a small piece of the optioned acreage to another buyer, Mr. Walters. Mr. Dunn acceded to the sale, which occurred on September 29, 2003. Mr. Dunn conceded that, in his conversation with Mr. Hoover, he learned that Douglas and Carol Rockwell had purchased the swath of land along the Shenandoah River out of the optioned acreage. Mr. Dunn also conceded that he deliberately chose not to confront Lawyer Rockwell in September 2003, and offered at least four reasons: (a) he thought that Mr. Hoover and Ms. Gray might be upset by getting caught in the confrontation, back out of the option and sell their farmland to another buyer; (b) he thought Lawyer Rockwell was his friend and, when confronted, would recognize his error and give the excess land back; (c) he feared that Lawyer Rockwell might find a competing buyer, and then convince Mr. Hoover and Ms. Gray to sell the optioned land to that other buyer to protect his 6.87 acre tract; and (d) he thought that the statute of limitation was three years.[13]

13. Mr. Dunn described the conversation with Mr. Hoover, and his reaction, in two depositions in the following manner:

> Dunn: ... Hugh called me down and told me that the Walters had wanted to purchase some more land from him because of—their house was in the flood plane (sic), and the only way to add to the house and get out of the flood plane was to add onto the back of it. And I told him I had no problem with him adding onto the back of it, it was just a rough hillside. But I told him, also, that I did not want to give him anything between the two, the Rockwell property ... and that house. And he looked at me real funny and said, well, Stanley, Doug has already taken that ...
>
> Q. And that would have been—was that sometime then prior to September 29 of 2003?
>
> \* \* \*
>
> A: All we knew [in 2003] was when I dealt with Hugh Hoover, when he asked permission to buy some property ... around Mr. Walters' property. I met with Hugh, and ... he told me that they wanted more to go around it and I said well, how much is it, Hugh and he said well, they don't want too much, just a little bit to add to the house.

> And I said to Hugh, Hugh, I don't mind you taking something behind their lot that's going up the hill, but do not take anything in this parcel, the dogleg parcel between Rockwell and Walters. And he just looked at me real funny [and] said, Stanley, I think it's already taken.
>
> Q: How did you respond?
>
> A: I was stunned and I thought for a minute and I thought, well, this is not Hugh's fault. I told him what Mr. Rockwell and I had agreed to.
>
> Q: What did you do next.
>
> A: I thought about it a lot and I decided it might be best in my interest to wait and not say anything, because Mr. Rockwell had kind of tried to guide the Hoover Farm from Mr. Yonkers and his group, he might try to guide it away from me, to make his contract good.
>
> Q: So, did you do any investigation into that?
>
> A: No, sir, I let it go. I thought the Statute of Limitations ran for three years and thought I was good.
>
> Q: So, you knew you had a potential claim against Mr. Rockwell at that time didn't you? ...
>
> A: I knew there was a possibility. I was hoping it was only a misunderstanding, we were good friends and that we would be able

These facts, taken together, suggest that the statutes of limitation on five of the Dunns' causes of action were tolled until no later than September 29, 2003. By September 29, 2003, the Dunns clearly knew, or by the exercise of reasonable diligence, should have known (1) that they had been injured, (2) that the Rockwells owed the Dunns a duty to act with due care (and a duty not to engage in misappropriation and conversion, or fraud) and that the Rockwells may have engaged in conduct that breached that duty, and (3) that the conduct of the Rockwells was the cause of their injury. *See* Syllabus Point 4, *Gaither v. City Hosp., Inc., supra.*

The plaintiffs filed their lawsuit in August 2006, more than two years later and, on the surface, it would appear that the plaintiffs' causes of action against the Rockwells are time-barred.

We now turn to the fourth step of our analysis to determine if any fraudulent conduct of the defendants acted to toll the statutes of limitation. Both of the Dunns admitted in their depositions that the Rockwells did nothing deliberate subsequent to September 29, 2003, to prevent them from investigating or pursuing a lawsuit against the Rockwells. The Dunns conceded that the Rockwells did nothing to fraudulently conceal any facts which would have led the Dunns to discover or to pursue their causes of action.

The fifth and final step of our analysis requires us to determine if the statute of limitation periods were arrested by some other tolling doctrine. We have previously adopted a doctrine that tolls statutes of limitation in negligence actions against attorneys. The continuous representation doctrine,[14] which we adopted in *Smith v. Stacy,* 198 W.Va. 498, 482 S.E.2d 115 (1996), tolls a statute of limitation in an attorney malpractice action "until the professional relationship terminates with respect to the matter underlying the malpractice action." Syllabus Point 6, *Smith v. Stacy, supra.* Justice Workman, writing for the Court, noted that the continuous representation doctrine "is designed, in part, to protect the integrity of the professional relationship by permitting the allegedly negligent attorney to attempt to remedy the effects of the malpractice and providing

to solve this real easy, but in case we couldn't, I wasn't going to be safe to buy the rest of the Hoover Farm.

&ast; &ast; &ast;

Q: I think we established . . . that by the end of September of 2003 you and your wife were aware of Mrs. Rockwell's acquisition of the property in dispute? . . .

A: We did not know who had bought it, if it was both of them or what . . .

Q: You didn't know specifically whether Mrs. Rockwell had purchased or Mr. Rockwell, but you knew that one of the Rockwell(s) or both of the Rockwell(s) had it?

A: That is true.

Q: So, by September 29, 2003 you knew that one of the Rockwell(s), or both of them, had acquired something that in your mind they had acquired wrongfully?

A: Something, but I didn't investigate it or go into it then.

Q: But you knew something was wrong at that point in time?

A: Yes, sir.

Q: . . . So, you didn't investigate it any further at that point in time, meaning back in September of 2003?

A: No, sir, my reasoning was after thinking the whole thing over and all the different things that had happened, that it would be best if I let it alone until we got possession of the Hoover Farm. . . .

Q: And am I correct in my understanding that the reason you didn't investigate, well, there really wasn't a reason, other than you decided not to at that point in time?

A: Knowing that Mr. Rockwell was upset that someone else before me may have purchased it and was not willing to let him have any more land around his, I knew that there could be trouble for me along those lines if I got into it then. And I also thought being my good friend that when I confront him with this he'll return it, but that did not happen.

Q: No one prevented you from investigating further back in September of 2003 did they?

A: No, sir, only my fear and risk of possibly losing the whole Hoover tract if I got into it and upset Hugh Hoover . . .

14. The rule is also called the continuous treatment doctrine, *see* Syllabus Point 4, *Forshey v. Jackson,* 222 W.Va. 743, 671 S.E.2d 748 (2008) (adopting "the continuous medical treatment doctrine"); the continuous relationship doctrine (*see, e.g., Bosse v. Quam,* 537 N.W.2d 8, 11 (S.D. 1995) (adopting the "continuous relationship exception" for accountant liability)); or the continuous undertaking doctrine (*see, e.g., McCormick v. Romans,* 214 Va. 144, 148, 198 S.E.2d 651, 654 (1973) ("where there is an undertaking which requires a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking.")).

uninterrupted service to the client." 198 W.Va. at 503, 482 S.E.2d at 120. *See also, VanSickle v. Kohout,* 215 W.Va. 433, 438, 599 S.E.2d 856, 861 (2004) (applying continuous representation doctrine, and holding that "when a victim of legal malpractice terminates his or her relationship with the malpracticing attorney, subsequent efforts by new counsel to reverse or mitigate the harm through administrative or judicial appeals do not toll the statute of limitations.").[15]

■ The continuous representation doctrine requires something more than a lawyer-client relationship. The doctrine requires a showing that the lawyer's representation of the client relates to the same transaction or subject matter as the allegedly negligent acts. *See* Syllabus Points 7, 8, and 9, *Smith v. Stacy, supra.*[16] The Court offered the following public policy argument behind adopting the doctrine:

> The purpose of the continuous representation rule is to avoid unnecessarily disrupting the attorney-client relationship. Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys although the relationship continues and there has not been and may never be any injury. The rule, limited to the context of continuous representation,

also is consistent with the purpose of the statute of limitations, which is to prevent stale claims and enable the defendant to preserve evidence. When the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.

> The rule of continuous representation is available and appropriate in those jurisdictions adopting the damage and discovery rules. The policy reasons are as compelling for allowing an attorney to continue efforts to remedy a bad result, even if some damages have occurred and even if the client is fully aware of the attorney's error. The doctrine is fair to all concerned parties. The attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages. The client is not forced to end the relationship, although the option exists. This result is consistent with any expressed policy basis for the statute of limitations.

198 W.Va. at 505, 482 S.E.2d at 122 (quoting Ronald E. Mallen and Jeffrey M. Smith, Legal Malpractice § 21.12, at 817 (4th ed. 1996) (footnotes omitted)).[17]

---

15. A corollary to the continuous representation doctrine is the equitable tolling theory of a "continuing tort," which states:

> Where a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease.

Syllabus Point 11, *Graham v. Beverage,* 211 W.Va. 466, 566 S.E.2d 603 (2002). *But see, Ricottilli v. Summersville Mem'l Hosp.,* 188 W.Va. 674, 677, 425 S.E.2d 629, 632 (1992) ("a continuing tort requires a showing of repetitious, wrongful conduct.... [A] wrongful act with consequential continuing damages is not a continuing tort.").

16. We stated, in Syllabus Points 7, 8, and 9 of *Smith v. Stacy, supra:*

> 7. The limitations period for a legal malpractice claim is not tolled by the continuous representation rule where an attorney's subsequent role is only tangentially related to legal representation the attorney provided in the matter in which he was allegedly negligent.

> 8. The continuous representation doctrine applies only to malpractice actions in which there is clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney.

> 9. The continuous representation doctrine should only be applied where the attorney's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship.

17. Another reason to toll the statute of limitation while representation continues is to protect the client from efforts by the attorney to wait out the running of the statute.

> This "continuous representation" rule was adopted in order to avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.

*Smith v. Stacy,* 198 W.Va. 498, 506, 482 S.E.2d 115, 123 (1996) (*quoting Laird v. Blacker,* 2

The evidence in the record below suggests that Lawyer Rockwell continued to have a professional legal relationship with the Dunns, a relationship that was directly related to the Dunns' negotiation and attempt to purchase the Hoover/Gray farmland, until the Spring of 2005. While the exact dates are unclear, it appears that Lawyer Rockwell prepared an extension agreement for the Dunns in the Spring of 2005. And although the Dunns never executed the extension agreement (and consummated their purchase of the farmland in Fall 2005), it appears that Lawyer Rockwell sent the Dunns a bill for his services.

On this record, it appears that there is evidence sufficient to say that questions of material fact exist for the finder of fact to resolve regarding whether the two-year statutes of limitation on the Dunns' five causes of action [18] against Lawyer Rockwell were tolled. In other words, on remand, the finder of fact should resolve whether the statute of limitation was tolled until the Spring of 2005 by his continuous representation of the Dunns in their effort to purchase the Hoover/Gray farmland.

 As to Ms. Rockwell, we believe that questions of material fact likewise exist concerning whether the statutes of limitation were tolled as to the five causes of action against her as well. Ms. Rockwell argues that because she is not an attorney, and was not in a continuous professional relationship with the Dunns, that she ought to receive repose because the Dunns did not file their actions against her within two years after September 29, 2003. However, Ms. Rock-well's argument overlooks one of the causes of action asserted against her: civil conspiracy. The Dunns allege that Ms. Rockwell conspired with her husband, and profited from his misdeeds during his continuous legal representation of the Dunns. While many of the Dunns' allegations concern tortious acts by Lawyer Rockwell affecting the 6.87 acre tract, the record clearly establishes that the tract was titled solely in Ms. Rockwell's name. The general rule is that if the statute of limitation is tolled as to one defendant in a civil conspiracy, it is tolled as to all alleged co-conspirators.[19] Because we believe that questions of material fact exist concerning whether the statutes of limitation were tolled as to Lawyer Rockwell, then questions of material fact also exist as to whether the statutes of limitation were tolled as to his co-conspirator, Ms. Rockwell.

In summary, we find that there are no statutes of limitation for the two equitable causes of action against the Rockwells, and find that questions of material fact exist for resolution on remand regarding whether the statutes of limitation for the five other causes of action against the Rockwells were tolled until the termination of Mr. Rockwell's representation of the Dunns in the Spring of 2005. We therefore conclude that the circuit court erred in holding that the causes of action against Ms. Rockwell were time-barred as a matter of law, and reverse the circuit court's August 15, 2008, summary judgment order.

### B. Martin & Seibert

The Dunns have asserted three causes of action against the Martin & Seibert law firm:

---

Cal.4th 606, 7 Cal.Rptr.2d 550, 557, 828 P.2d 691, 698 (1992)).

**18.** To reiterate, those five causes of action subject to the two-year statutes of limitation are misappropriation and conversion; fraud; professional negligence by Lawyer Rockwell; breach of fiduciary duty by Lawyer Rockwell; and civil conspiracy by both Lawyer and Ms. Rockwell. There is no statute of limitation for the Dunns' equitable causes of action for rescission, cancellation and reformation of the deed, or for unjust enrichment.

**19.** Jurisdictions usually hold that the statute of limitation for a claim based upon an allegation of civil conspiracy accrues from the date of discovery of "the last overt act done in furtherance of the conspiracy, or from the last overt act causing damage to the plaintiff, or from the date of each overt act causing damage." 16 Am. Jur. 2d "Conspiracy," § 65. Our review of the law suggests that many allegations of civil conspiracy arise as a result of several defendants acting in concert to fraudulently conceal from the plaintiff the existence of a cause of action. In those cases, "one conspirator's act of fraudulent concealment, if within the scope of the conspiracy, tolls the statute as to the other alleged conspirators, [and] it follows that the tolling effect should apply also to the substantive wrongs underlying the conspiracy[.]" *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C.Cir.1989).

direct liability for its own negligent supervision of Lawyer Rockwell; breach of fiduciary duty toward a client; and vicarious liability under *respondeat superior*. The record is undisputed that Lawyer Rockwell left his employment with Martin & Seibert on March 31, 2004.

The first step in our analysis is to determine the applicable statute(s) of limitation. The parties agree that two of the causes of action against Martin & Seibert—the causes of action for negligent supervision and breach of fiduciary duty—are governed by the two-year limitation period contained in *W.Va.Code*, 55–2–12. *See Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 583, 567 S.E.2d 294, 299 (2002) (negligence actions in general); *Vorholt v. One Valley Bank*, 201 W.Va. 480, 486, 498 S.E.2d 241, 247 (1997) (actions for breach of fiduciary duty).

▇▇ As for the third cause of action, the doctrine of *respondeat superior* imposes liability on an employer for the acts of its employees within the scope of employment, not because the employer is at fault, but merely as a matter of public policy. *See Cochran v. Michaels*, 110 W.Va. 127, 130–131, 157 S.E. 173, 174–75 (1931) ("the rule is based on public policy").[20] *See also, Oelschlager v. Magnuson*, 528 N.W.2d 895, 899 (Minn.App.1995) ("Respondeat superior imposes liability on an employer for the acts of its employees, not because the employer is at fault, but as a matter of public policy."); *Kocsis v. Harrison*, 249 Neb. 274, 280, 543 N.W.2d 164, 168–69 (1996) (citations omitted) ("Under the doctrine of respondeat superior, an employer is held vicariously liable for the negligent acts of an employee committed while the employee was acting within the scope of the employer's business. If an employee is not liable, the employer cannot be liable under the doctrine of respondeat superior. The principal's liability is derived sole-

ly from that of its agent."). We stated the doctrine of *respondeat superior* this way in Syllabus Point 3 of *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981):

An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.

*See also, Griffith v. George Transfer & Rigging, Inc.*, 157 W.Va. 316, 201 S.E.2d 281 (1973) ("The universally recognized rule is that an employer is liable to a third person for any injury to his person or property which results proximately from tortious conduct of an employee acting within the scope of his employment. The negligent or tortious act may be imputed to the employer if the act of the employee was done in accordance with the expressed or implied authority of the employer."); Syllabus Points 3 (in part) and 4, *O'Dell v. Universal Credit Co.*, 118 W.Va. 678, 191 S.E. 568 (1937) ("The legal relationship of master and servant is commonly understood to arise when one person subordinately serves another, both consenting thereto. . . . The master is answerable to a stranger for the negligent act of a person employed by the [master or] master's authorized agent, if the act is within the scope of the person's employment.")

▇▇ Determining the applicable statute of limitation when a plaintiff alleges that an employer is vicariously responsible for the acts of an employee is more difficult. Because the employer may only be held liable to the extent that the employee can be held liable, and only for acts committed by the employee in the course of his or her employment, the statute of limitation applicable to an employer is determined by the act of the employee.[21] We must therefore examine

---

**20.** The California courts have articulated three reasons for applying the doctrine of *respondeat superior*:

(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those

who benefit from the enterprise that gave rise to the injury.

*Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 209, 285 Cal.Rptr. 99, 814 P.2d 1341, 1343 (1991).

**21.** *D.M.S. v. Barber*, 645 N.W.2d 383, 391 (Minn. 2002) ("[F]or purposes of the statute of limita-

Martin & Seibert's potential liability under *respondeat superior* in view of the causes of action against Lawyer Rockwell.

As previously discussed, the plaintiffs allege seven causes of action against Douglas Rockwell. The first two of those causes of action—to rescind or reform a deed, and for unjust enrichment—seek equitable relief. While we held above that those causes of action are not governed by any statute of limitation, the plaintiffs concede that they are not seeking any equitable relief from Lawyer Rockwell's employer, Martin & Seibert. Furthermore, as to the plaintiffs' final cause of action—civil conspiracy—the plaintiffs' likewise concede that there is no evidence that Martin & Seibert conspired with Lawyer or Ms. Rockwell.

 Accordingly, it appears that the plaintiffs may only conceivably recover damages on a *respondeat superior* theory from Martin & Seibert for the remaining four causes of action. The Dunns allege that Lawyer Rockwell, while employed by Martin & Seibert, and within the scope of his employment, engaged in the misconduct that supports the four causes of action (misappropriation and conversion; fraud; professional negligence; and breach of fiduciary duty). The Dunns point out that many of the legal documents in the record prepared by Mr. Rockwell before March 2004 bear the name and address of the Martin & Seibert law firm, and Mr. Dunn asserts before March 2004 he communicated with Mr. Rockwell at Martin & Seibert's law offices. We conclude, on these facts, that the statutes of limitation for the *respondeat superior* cause of action against Martin & Seibert would be the same as for the four causes of action—that is, two years under *W.Va.Code*, 55-2-12.

Crippling to the plaintiffs' case against Martin & Seibert is the fact that by September 29, 2003, the plaintiffs' knew that they had a potential claim against the Rockwells but did nothing. We do not believe, on these facts, that the statute of limitation was tolled beyond September 29, 2003, under the discovery rule as outlined in *Gaither, supra.*

The next step in our analysis is to determine whether some act of concealment by Martin & Seibert tolled the statute of limitation. The Dunns have directed us to no fact in the record suggesting that Martin & Seibert engaged in any fraudulent act that deterred the Dunns from promptly filing suit.

The final step in our analysis is to determine whether some other tolling doctrine arrested the statute of limitation. The only doctrine cited by the Dunns is the continuous representation doctrine. The record is clear that Douglas Rockwell continuously represented the plaintiffs in their attempt to acquire the Hoover/Gray farmland during his employment with Martin & Seibert. However, that employment terminated on March 31, 2004.

We believe that, under the continuous representation doctrine, the two-year statutes of limitation against Martin & Seibert were tolled until March 31, 2004. However, because the plaintiffs did not bring their lawsuit until August 2006, on this record we find that Martin & Seibert is entitled to repose. Accordingly, we hold that the circuit court was correct to find that the plaintiffs' three causes of action against Martin & Seibert were barred by the statutes of limitation, and hold that the circuit court's June 19, 2008, summary judgment order should be affirmed.

### IV.

### Conclusion

The circuit court's June 19, 2008 order granting summary judgment to defendant Martin & Seibert is affirmed.

tions, respondeat superior claims are treated the same as causes of action against the employee who committed the tort[.]"); *Lourim v. Swensen,* 328 Or. 380, 390, 977 P.2d 1157, 1162 (1999) ("there is no explicit reference to a statute of limitations for actions for vicarious liability based on the doctrine of respondeat superior. The limitations period is the same as that for the underlying tort."); *Kocsis v. Harrison,* 249 Neb. 274, 280, 543 N.W.2d 164, 168–69 (1996) ("The controlling statute of limitations applicable to the employer is that which would apply to the employee. Therefore, if the action is brought within the limitations period that applies to the employee's tortious conduct, the action is not time barred as to the employer whose liability is solely vicarious.").

64

The circuit court's August 15, 2008 order granting summary judgment to defendant Carol Rockwell is reversed, and the case is remanded for further proceedings.

Affirmed, in part, reversed, in part, and remanded.

Chief Justice BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

Justice DAVIS concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

DAVIS, J., concurring, in part, and dissenting, in part, joined by BENJAMIN, C.J.:

In this proceeding, the Court was called upon to decide whether the trial court correctly granted summary judgment in favor of two defendants: Carol K. Rockwell and the law firm of Martin & Seibert. The majority opinion affirmed summary judgment in favor of the law firm. I concur in that decision. However, the majority opinion reversed the summary judgment ruling in favor of Mrs. Rockwell. I dissent from that decision. Further, as set out below, I dissent from two procedural matters addressed in the majority opinion.

**1.**

## The Majority Opinion Overruled Two Principles of Law in *Cart v. Marcum* but Adopted Those Same Principles of Law in its Majority Opinion

For reasons that are not clear to me, the majority opinion expressly overruled the decision in *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644 (1992). It is unnecessary for the majority opinion to have overruled *Cart* because the majority opinion actually proceeded to adopt the two key principles of law set out in the *Cart* opinion. Before I address the essence of my argument on this issue,

some historical background information is necessary.

The decision in *Cart* set out a principle of law that limited the discovery rule to situations where the defendant engaged in conduct that prevented a plaintiff from knowing of his/her cause of action. Subsequent to *Cart*, this Court issued the opinion of *Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487 S.E.2d 901(1997). The *Gaither* opinion set out a more general principle of law regarding the application of the discovery rule to toll the running of the statute of limitations.[1] In the concurring opinion of Justice Starcher in *Miller v. Monongalia County Board of Education*, 210 W.Va. 147, 556 S.E.2d 427 (2001), he explained how *Gaither* and *Cart* should be applied. Justice Starcher wrote:

> If the lawsuit was filed after the time period specified in the statute, the plaintiff can assert the discovery rule as stated in *Gaither v. City Hospital*. ... As a last resort, the plaintiff can allege some affirmative misconduct by the defendant prevented the plaintiff from knowing of the elements of their cause of action, as stated in *Cart v. Marcum*.

*Miller*, 210 W.Va. at 153, 556 S.E.2d at 433. Subsequent to *Miller*, this Court applied *Gaither* and *Cart* in the manner suggested by Justice Starcher. *See Legg v. Rashid*, 222 W.Va. 169, 663 S.E.2d 623 (2008) (per curiam); *Roberts v. West Virginia Am. Water Co.*, 221 W.Va. 373, 655 S.E.2d 119 (2007); *Davey v. Estate of Haggerty*, 219 W.Va. 453, 637 S.E.2d 350 (2006) (per curiam); *Merrill v. West Virginia Dep't of Health & Human Res.*, 219 W.Va. 151, 632 S.E.2d 307 (2006) (per curiam); *McCoy v. Miller*, 213 W.Va. 161, 578 S.E.2d 355 (2003) (per curiam).

Prior to the majority's opinion in this case, the decision in *Cart* stood for two principles of law. The first principle is set out in Syllabus point 2 of *Cart* as follows:

> (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.
> 199 W. Va. 706, 487 S.E.2d 901.

---

1. *Gaither's* general discovery rule is set out in Syllabus point 4 of the opinion as follows:

 In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know

The "discovery rule" is generally applicable to all torts, unless there is a clear statutory prohibition of its application.

188 W.Va. 241, 423 S.E.2d 644. The majority opinion overruled this principle of law in *Cart.* However, the majority opinion then adopts this same principle of law in new Syllabus point 2 of its opinion as follows:

The "discovery rule" is generally applicable to all torts, unless there is a clear statutory prohibition of its application.

This "overruling" might at first blush appear to be a mere unintentional lapse in logic. However, it was more than a mere unintentional lapse in logic because, as I will show, it was repeated.

The second principle of law that *Cart* stood for was set out in the opinion as follows:

The "discovery rule" . . . is to be applied with great circumspection on a case-by-case basis only where there is a strong showing by the plaintiff that he was prevented from knowing of the claim at the time of the injury. . . . In order to benefit from the rule, a plaintiff must make a strong showing of fraudulent concealment[.]

*Cart,* 188 W.Va. at 245, 423 S.E.2d at 648.[2] The majority opinion overruled this principle of law in *Cart.* Then, the majority opinion applies this same principle of law in new Syllabus point 5 of its opinion, in part, as follows:

[I]f the plaintiff is not entitled to the benefit of the discovery rule, then the court should determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled.

Two things should be understood about new Syllabus point 5 of the majority opinion. First, it adopts the principle of law set out

**2.** This principle was set out more generally in Syllabus point 3, in part, of *Cart* as follows:
[T]he "discovery rule" applies only when there is a strong showing by the plaintiff that some

*Cart.* Second, to legitimize its adoption and application of *Cart's* principle of law, new Syllabus point 5 of the majority opinion states that its "fraud" principle of law is not a discovery rule. That is, the quoted part of the new syllabus point starts out by saying: "[I]f the plaintiff is not entitled to the benefit of the discovery rule[.]" In other words, the new syllabus point attempts to say that *Gaither* is the discovery rule and the "fraud" principle it sets out is not a discovery rule. Simply put, this is wrong. Ultimately, under the majority's "fraud" principle, if a plaintiff establishes fraudulent concealment, the new syllabus point states that "the statute of limitation is tolled." Despite the majority opinion's attempt to disassociate its "fraud" principle from being an aspect of the discovery rule, " 'it looks like a duck, walks like a duck and quacks like a duck[.]' " *Law v. Monongahela Power Co.,* 210 W.Va. 549, 563, 558 S.E.2d 349, 363 (2001) (per curiam) (Davis, J., dissenting) (quoting *Adkins v. West Virginia Dep't of Educ.,* 210 W.Va. 105, 109, 556 S.E.2d 72, 76 (2001) (per curiam) (Albright, J., dissenting)). There simply is no logic to new Syllabus point 5 of the majority opinion, nor was there any logic in its overruling *Cart* and ultimately passing off the principles of *Cart* as its own creation.

**2.**

**Rather than Clarifying the Law on a Cause of Action for Civil Conspiracy, the Majority Opinion Has Added Confusion**

New Syllabus point 8 of the majority opinion states:

A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by lawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

New Syllabus point 9 of the majority opinion states:

action by the defendant prevented the plaintiff from knowing of the wrong at the time of the injury.
188 W. Va. 241, 423 S.E.2d 644.

A civil conspiracy is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but shared a common plan for its commission with the actual perpetrators.

There simply is no need for, nor logic to support, the creation of new Syllabus points 8 and 9. Ultimately, the end result is that our law on civil conspiracy is no longer simple and straightforward.

In *Kessel v. Leavitt*, 204 W.Va. 95, 128, 511 S.E.2d 720, 753 (1998), we said that "[t]he law of this State recognizes a cause of action sounding in civil conspiracy." This Court recognized the concept of a civil conspiracy in *Dixon v. American Industrial Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150 (1979), where we adopted the definition of civil conspiracy set forth in 15A C.J.S. *Conspiracy* § 1(1). The Court stated in *Dixon:*

> As succinctly stated in 15A C.J.S. Conspiracy, Sec. 1(1), a civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.

*Dixon*, 162 W.Va. at 834, 253 S.E.2d at 152. This Court went on to hold in Syllabus point 1 of *Dixon*, in part, the following:

> In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]

*See Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986) (discussing civil conspiracy); *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982) (same), *overruled on other grounds by Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). Prior to the decision in the majority opinion, our law on civil conspiracy was rather straightforward. However, I have no doubt that, as a result of the majority opinion's unwarranted "clarification" of the tort of civil conspira-cy, a great deal of confusion will now surround this cause of action.

### 3.

### The Majority Opinion Has Litigated the Rights of a Defendant Who Was Not a Party to this Appeal

The facts of this case revealed that the plaintiffs sued three defendants: the law firm, Mrs. Rockwell, and Douglas S. Rockwell. The circuit court granted partial summary judgment in favor of Mrs. Rockwell and the law firm. The circuit court *did not* grant summary judgment to Mr. Rockwell. Consequently, this appeal did not involve any claim the plaintiffs have against Mr. Rockwell. Despite the fact that the plaintiffs' claims against Mr. Rockwell *were not before this Court*, the majority opinion decided Mr. Rockwell's rights with respect to the continuous representation doctrine.

To reinstate causes of action against Mrs. Rockwell, the majority opinion decided a potential defense by Mr. Rockwell. The majority opinion did this as follows:

> On this record, it appears that there is evidence to say that questions of material fact exist for the finder of fact to resolve regarding whether the two-year statutes of limitation on the Dunns' five causes of action against Lawyer Rockwell were tolled. In other words, on remand, the finder of fact should resolve whether the statute of limitation was tolled until the Spring of 2005 by his continuous representation of the Dunns in their effort to purchase the Hoover/Gray farmland.

Maj. Op. at 61, 689 S.E.2d at 273. The legal significance of what the majority opinion has done is very unsettling. In the event Mr. Rockwell loses the case below and appeals, he cannot assign as error the trial court's denial of any summary judgment motion he made regarding the continuous representation doctrine.[3] The majority opinion in the instant appeal has already decided that the issue must go to the jury. The resolution of this issue against Mr. Rockwell, when the

---

3. I will note that Mr. Rockwell did in fact file a motion for summary judgment, which was denied by the circuit court. Under our rules, Mr. Rockwell could not directly appeal the denial of his motion for summary judgment. Any such appeal would have to come after the case has been resolved on the merits.

claims against him *were not properly before this Court,* sets a dangerous precedent.

I believe that the majority opinion was compelled to decide the rights of Mr. Rockwell because that was the only way in which it could reverse the summary judgment order in favor of Mrs. Rockwell.[4] I cannot tolerate nor will I ever approve of litigating the rights of a party not before this Court in order to keep another party in the case.

The majority's decision to *sua sponte* determine that Mr. Rockwell's potential defense under the continuous representation doctrine presented jury issues is inconsistent with this Court's recent decision in *State ex rel. Board of Education of County of Putnam v. Beane,* 224 W.Va. 31, 680 S.E.2d 46 (2009) (per curiam). The decision in *Beane* involved an abuse and neglect proceeding in the Circuit Court of Wood County. In that case, the circuit court entered an order requiring the Putnam County Board of Education ("the School Board") to provide and pay for a full-time nurse for a special-needs student. The School Board filed a writ of prohibition with this Court seeking to prevent enforcement of the order because it was not a party to the litigation in Wood County. We granted the writ to the School Board based upon the following reasoning:

> While doing what is in the best interests of the child is the primary goal of abuse and neglect proceedings, this goal does not relieve a court from complying with fundamental due process requirements. The most fundamental due process protections are notice and an opportunity to be heard. As we held in Syllabus Point 2 of *Simpson v. Stanton,* 119 W.Va. 235, 193 S.E. 64 (1937): "The due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard."

....

> The circuit court clearly denied the School Board its fundamental due process rights to notice and an opportunity to be heard. In so doing, the circuit court did not have before it important evidence concerning the child's medical and educational history. We find it troubling that neither the special prosecuting attorney, the guardian *ad litem,* DHHR, nor the circuit court recognized the need to include the School Board in these hearings wherein the School Board's interests were considered and decided *ex parte.*

*Beane,* 224 W.Va. at 35–36, 680 S.E.2d at 50–51.

Although I totally agreed with this Court's questioning of the trial court in *Beane* for deciding the rights of a *party not before that court,* I am very troubled to find that the majority in this case would do exactly what we prohibited the trial court in *Beane* from doing. In the final analysis, the majority opinion stands for the following proposition: due process prevents a trial court from litigating the rights of a party not before that court, but this Court has the authority to disregard due process in order to achieve a certain result. This double standard is wrong and establishes a very dangerous precedent.

For the reasons set out above, I respectfully concur, in part, and dissent, in part. I am authorized to state that Chief Justice Benjamin joins me in this separate opinion.

---

4. In my review of the plaintiffs' brief, I found that they raised the continuous representation doctrine only in the context of trying to keep the law firm in the case. Specifically, the plaintiffs stated in their brief:

> In its final examination of the statute of limitations, the circuit court held that the plaintiffs failed to offer any proof that the "continuous representation" doctrine should be applied to toll the statute of limitations on their claims against Martin & Seibert.

Appellant's Br. at 31 (citation omitted). The plaintiffs did not raise the issue of the continuous representation doctrine against Mrs. Rockwell. Rather, the majority opinion asserted this issue against her.